UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:17CR83 (RNC) |
| | : | |
| v. | : | |
| | : | |
| PETER YURYEVICH LEVASHOV, aka | : | July 6, 2021 |
| "Petr Levashov," "Peter Severa," | : | |
| "Petr Severa," and "Sergey Astakhov" | : | |

### DEFENDANT'S OBJETIONS TO THE PRESENTENCE INVESTIGATION REPORTS ("PSR") AND SENTENCING MEMORANDUM

Now comes the defendant, Peter Levashov, by and through his undersigned attorney, and respectfully requests that this Honorable Court, in light of *Gall v. United States*, 552 U.S. 38 (2007) and the factors set forth in 18 U.S.C. § 3553(a), sentence him to the most lenient sentence permissible under the law; one that is sufficient, but not greater than necessary, to comply with the purposes of sentencing. In support, the following is offered:

### INTRODUCTION

Peter Levashov is a uniquely extraordinary person. The circumstances surrounding his conviction are equally so. Truly, his remorse, contrition, and overall acceptance of responsibility weight heavily in favor of a lenient sentence, more so than in most other, if not all, cases. Notwithstanding the seriousness of the underlying conduct of his convictions, when taking into consideration all of the factors that will be presented to this Court prior to sentencing, a sentence of time-served will be a just and reasonable sentence.

The past four-and-a-half years have certainly put his life and his decisions into

perspective.  Aside from the general weight of being under federal indictment, they have been spent locked up in two foreign countries, away from his family, where he does not know anyone, and spent in the midst of an unprecedented worldwide pandemic.  Put simply, these four-and-a-half years have felt like an eternity.  He spends his days keeping to himself, walking around in constant fear of the unknown. He has weathered under the difficulty of coming to grips with how he allowed himself to come to this situation; he let not only himself down, but more importantly, his family.  To say this humbled him would be an understatement.  Mr. Levashov now comes before this Court a broken and defeated.  He knows what he did was wrong, and for that is nothing but ashamed, humbled and contrite.

There is no denying the seriousness of Mr. Levashov's transgressions, and he does not intend on doing so – he was clearly wrong.  Rather, he offers himself to the mercy of this Court, to consider not only those actions that brought him before this Court, but to consider the full value of a man's life, when fashioning its reasonable sentence.  Taking together the nature and circumstances surrounding his conviction, his personal history and characteristics, his complete and candid acceptance of responsibility, and considerations of recidivism and specific deterrence, Mr. Levashov respectfully asks this Honorable Court to sentence him to the most lenient sentence permissible under the law; one that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## I.   OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT ("PSR")

The following objections to the PSR are being respectfully resubmitted after

having been previously articulated in his initial objections to the PSR but nevertheless applied.

### A. OBJECTION TO 2-LEVEL ENHANCEMENT PURSUANT TO § 2B1.1(B)(10)(B) AND (C)

Mr. Levashov was charged with committing various cybercrimes over the course of the charged schemes. Such crimes do not fit within the framework of offenses that were committed outside of the United States. Specifically, the Guidelines impose an enhancement if "a substantial part of the fraudulent scheme was committed outside the United States." U.S.S.G. §2B1.1(b)(10)(B). The application notes indicate that the United States means a physical place because it defines the United States as the 50 states, the District of Columbia, and its other territories. §2B1.1, comment. (n.9).

Cybercrimes, however, are committed through the Internet which is not a physical space surrounded by borders. "The Internet is an international network of interconnected computers." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 849 (1997); *see also Brookfield Communications v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1044 (9th Cir. 1999) ("The Internet is a global network of interconnected computers which allows individuals and organizations around the world to communicate and to share information with one another."); Dan Hunter, *Cyberspace as Place and the Tragedy of the Digital Anticommons*, 91 Cal. L. Rev. 439 (2003) (arguing that the Internet and cyberspace should be considered its own legal autonomous space); Mark A. Lemley, *Place and Cyberspace*, 91 Cal. L. Rev. 521, 523

(2003) ("No one is 'in' cyberspace. The Internet is merely a simple computer protocol…"); Marc D. Goodman & Susan W. Brenner, *The Emerging Consensus on Criminal Conduct in Cyberspace*, 2002 UCLA J. L. & Tech. 3 (2003) (""Computer-related crimes are committed across cyber space and do not stop at the conventional state-borders."). Thus, cybercrimes are not committed in a physical space as contemplated by the Guidelines and the enhancement is inapplicable.

If such enhancement is allowed under these circumstances, it would set a precedent that almost any cybercrime or crime committed through the internet would automatically trigger the enhancement and make its application to individuals overly broad. Computers, servers, and cloud servers are located around the globe. For example, Microsoft had a data center located in Ireland that it stored emails from its email service. *See United States v. Microsoft*, 584 U.S. __, 138 S. Ct. 1186 (2018). If an cyber-attack occurred on Microsoft's email service users, then the enhancement would apply as a substantial part occurred outside the United States—even if the offender and victims resided in the U.S. This cannot be the case.

If anything, the crimes Mr. Levashov was charged with occurred in the United States, as that is where the infected computers that he was charged with were located here. Modernly, courts dealing with cybercrimes or computer-based causes of action find that unauthorized access or hacking a device is a trespass to one's chattel. *See, e.g., Am. Online, Inc., v. Nat'l Health Care Disc., Inc.*, 174 F. Supp. 2d 890 (N.D. Iowa 2001); *Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238 (S.D.N.Y. 2000); *United States v. Werdene*, 883 F.3d 204 (3rd Cir. 2018); *United States v. Henerson*, 906 F.3d

4

1109 (9th Cir. 2018).  Considering the computers that were the basis charged crimes were in the United States, the trespass occurred in the United States.

For the sophisticated means aspect of the enhancement to apply, the conduct must be "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. §2B1.1, comment. (n.9). The court must look at whether the defendant's scheme "was notably more intricate than that of a garden-variety…scheme." *United States v. Cole*, 296 Fed. Appx. 195, 197 (2nd Cir. 2008) (citing *United States v. Hance*, 501 F.3d 900, 909-10 (8th Cir. 2007)); *see also United States v. Lewis*, 93 F.3d 1075, 1083 (2nd Cir. 1996). "The [sophisticated means] enhancement requires some means or execution that separates the offense before us from the ordinary or generic." *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012).

The mere fact that a complex or intricate crime occurred "is inadequate for demonstrating the complexity required for the enhancement" and the enhancement requires "more than the forgeries, misrepresentations, and concealment inherent" in the fraud. *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014). For example, in *Adepoju*, the government failed to meet its burden of demonstrating how the defendant's bank fraud scheme was more complex or intricate than ordinary bank frauds. *Id*. It was undisputed that the defendant used forged checks and a stolen identity to commit the bank fraud, but "virtually all bank fraud will involve misrepresentation[s]" of this short. *Id*. "[T]he mere presence of the tools of fraud and the attempt to use" them does not establish how the "conduct was especially complex

or intricate above and beyond the typical [] violations." *Id.* at 258; *see also United States v. Montano*, 250 F.3d 709, 715 (9th Cir. 2001) (finding that because smuggling necessarily involves concealment, sophisticated means requires more than what is necessary to commit the crime). The same analysis must be done here.

To that end, Mr. Levashov's offense must be judged against the garden variety cybercrimes (not wire fraud generally), and to which it does not appear more complex or intricate on its face. On average, there are 2,244 hacker attacks per day occurring roughly at a rate of once per 39 seconds.[1] Levashov's use of ransomware does not make it more complex or intricate as, in 2015 through 2017, there was an average of between 933 and 1,271 detections of ransomware *per day*.[2] Neither does the use of malware and trojan horses indicate that Levashov's offense was more complex or intricate. Cybersecurity firm Symantec blocked over 78 million malware infection attempts in the third quarter of 2020 alone.[3] Not even the use of a botnet establishes the requisite complexity. Botnets can be purchased from the darknet for as low as $30 and there are even lessons on YouTube for how to use them.[4] Just as in *Adepoju*, merely possessing the tools to commit a fraud, does not make the fraud more complex or intricate on its own. His offense was a straightforward cybercrime using the same

---

[1]  Rob Sobers, *134 Cybersecurity Statistics and Trends for 2021*, (Jan. 13, 2021) *available at* https://www.varonis.com/blog/cybersecurity-statistics/
[2]  Symantec, *Internet Security Threat Report*, Vol. 23, 15, Apr. 2018, *available at* http://images.mktgassets.symantec.com/Web/Symantec/%7B3a70beb8-c55d-4516-98ed-1d0818a42661%7D_ISTR23_Main-FINAL-APR10.pdf?
[3]  Symantec, *Threat Landscape: Trends – Q3 2020*, Dec. 18, 2020, *available at https://symantec-enterprise-blogs.security.com/blogs/threat-intelligence/threat-landscape-trends-q3-2020*
[4]  Crowdstrike, *What Is A Botnet?*, Aug. 13, 2020, *available at https://www.crowdstrike.com/epp-101/botnets/*

6

tools that common cybercrimes utilize. Nor did Mr. Levashov create the malware or ransomware that is the subject of the offenses. He merely emailed them out using the botnet.

### B. OBJECTION TO 2-LEVEL ENHANCEMENT PURSUANT TO § 3B1.3

The §3B1.3 enhancement is only applicable if the defendant "used a special skill, in a manner that significantly facilitated the commission or concealment of an offense." U.S.S.G §3B1.3. A special skill is one that "usually require[es] substantial education, training, or licensing. Examples in would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." §3B1.3, comment. (n.4). "Computer skills cover a wide spectrum of ability. Only where a defendant's computer skills are particularly sophisticated do they correspond to the Sentencing Commission's example of 'special skills'--lawyer, doctor, pilot, etc. Courts should be particularly cautious in imposing special skills adjustments where substantial education, training, or licensing is not involved."

As an example, in *United States v. Godman*, the enhancement did not apply to a counterfeiter who used a computer program he purchased to produce counterfeit money. 223 F.3d 320, 322-32 (6th Cir. 2000). The enhancement did not apply because his level of computer skill was not analogous to the level of skill possessed by lawyers, doctors, pilots, and other specialized professionals. *Id.* at 323. While his computer skills may not have been possessed by the general public, the "emphasis is better paced on the difficulty with which a particular skill is acquired." *Id.* at 322. "Such skills are acquired through months (or years) of training, or the equivalent in self-

tutelage" and self-taught skills must be "particularly sophisticated." *Id.* at 323. In *Godman*, defendant had only purchased the program and self-taught himself how to use it in a short period of time. Thus, the skill was not akin to the Guideline's examples and the enhancement was inapplicable.

While, admittedly, Mr. Levashov possesses an advanced degree in computer science, there is nothing to suggest that his education helped facilitated the instant offense. In the agreed upon facts, there is nothing to suggest that Mr. Levashov used any sort of special skill to develop a botnet, ransomware, malware, or help moderate internet forums. His crimes could have been perpetrated by anyone who possessed the tools he had to mass distribute emails in the way that Mr. Levashov did. This is akin to purchasing a program from a store and self-teaching himself how to use them. Hacking tools such as botnets, malware, and ransomware are available to purchase online from the dark web. And people can self-teach themselves how to use them from watching YouTube tutorials or reading forums online. While the scope of his offense was certainly large, one does not need the specialized skill in order to execute the charged offense.

## II.   SENTENCING CONSIDERATIONS PURSUANT TO 18 U.S.C. § 3553(A) SUPPORTING A BELOW-GUIDELINES SENTENCE

This Court maintains unfettered discretion to fashion a sentence that punishes the offender, as opposed to the crime itself. *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011); *United States v. Cavera*, 550 F.3d 180, 188 (2nd Cir. 2008)( "A sentencing judge has a very wide latitude to decide the proper degree of punishment for an

individual offender and a particular crime.") It is the sentencing court that "is in the best position to judge the appropriateness of a sentencing departure in light of the defendant's overall history and character, his remorse or lack of it, and other factors bearing on the sentence to be imposed." *United States v. Crowley*, 318 F.3d 401, 421 (2nd Cir. 2003). *See also United States v. Corsey*, 723 F.3d 366, 374 (2nd Cir. 2013) (stating that sentencing courts have broad discretion to fashion a sentence due to being "better positioned institutionally to determine the appropriate sentence in a particular case."). After first calculating the applicable sentencing range, district courts are then tasked with imposing a sentence that is reasonable under 18 U.S.C. § 3553(a). However, because sentencing guideline ranges are not to be presumed reasonable, this Court must consider whether they actually conform to the circumstances of the case.[5] *Nelson v. United States*, 555 U.S. 350 (2009) (*per curiam*); *United States v. Genao*, 869 F.3d 136 (2nd Cir. 2017)( "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense.")

In doing so, this Court should consider the respective parties' arguments as to whether the guidelines range should apply, but "without any thumb on the sale

---

[5] While the Guideline ranges "reflect a rough approximation of sentences that might achieve § 3553(a) objectives," trial "judges have greater familiarity with the individual case and the individual defendant before him than the Commission or the appeals court." *United States v. Henderson*, 649 F.3d 955, 959 (9th Cir. 2011) (internal quotations omitted). "A district judge's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the heartland to which the Commission intends individual Guidelines to apply." *Id.*; *quoting Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

favoring a guideline sentence." *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007); *see also Sparks v. United States*, 555 U.S. 261, 264-65 (2009) (district court may sentence a defendant to a sentence below the guideline range based on a disagreement with a particular guideline even in an ordinary case). *United States v. Jones*, 531 F.3d 163, 171 (2nd Cir. 2008) (stating that constitutional concerns prohibit a presumption of unreasonableness for below guidelines sentences as the Sixth Amendment prohibits "rules or standards that effectively place a thumb on the scales in favor of Guidelines sentences.") (quoting *Kimbrough v. United States*, 128 S. Ct. 558, 577 (2007) (Scalia, J., concurring)). So long as the selected sentence is "rooted in § 3553(a), sufficiently individualized to the circumstances of [the] case, and generally associated with sentencing leniency[,]" a below guidelines sentence is appropriate. *United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007)

In fashioning his sentence – one that is sufficient but not greater than necessary – Mr. Levashov respectfully asks this Court to consider the nature and circumstances of the offense and conviction, his personal history and characteristics, and considerations of just punishment, among the other § 3553(a) considerations that are outlined below. *United States v. Pugh*, 945 F.3d 9, 24 (2nd Cir. 2019)( "Having considered all of the § 3553(a) factors, the district court must reach an informed and individualized judgement in each case as to what is sufficient but not greater than necessary to fulfill the purposes of sentencing.").

### A. ADVISORY GUIDELINE RANGE

A sentencing court's inquiry begins by calculating the defendant's advisory

Guideline range. *Cavera*, 550 F.3d at 189 ("A district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range."); *United States v. Schroeder*, 536 F.3d 746, 755 (7th Cir. 2008).   Based on the above objections, Mr. Levashov's total adjusted offense level is 28.   Coupling that with a criminal history category of I, Mr. Levashov's advisory sentencing range is 78 to 97 months' imprisonment, followed by a mandatory, consecutive two-year term of imprisonment.

However, a sentencing court may not presume a sentence with the Guideline range is reasonable. *Cavera*, 550 F.3d at 189.   Nor can it presume that a sentence below the guideline range is unreasonable. *United States v. Jones*, 531 F.3d 163, 171 (2nd Cir. 2008). The Guidelines range is just one factor among the others that are considered when fashioning a sentence. *See United States v, Ingram*, 721 F.3d 35, 37 (2nd Cir. 2013) (stating that the "advisory Guideline range" is one factor to consider during sentencing). As one district court judge has put it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."[6]   In light of his individual history and characteristics, the nature and circumstances of the offense and conviction, and other relevant considerations, Mr. Levashov respectfully requests this Honorable Court to exercise its discretion, in accordance with the § 3553(a) factors and *Gall*, and sentence him as leniently as is permissible under the law.

---

[6] Terry Carter, *Rakoff's stance on the SEC draws fire, praise – and change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.

### B. Levashov's Personal History and Characteristics

Mr. Levashov is a caring and generous person who cares deeply not only for his close friends and family.  No matter the circumstances or the length of Mr. Levashov's relationship with an individual, there is no disparity between the level of care, loyalty, or generosity they experience.   The character letters submitted on his behalf are replete with anecdotes illustrating his unwavering "kindness and empathy."[7]   Indeed, he has made mistakes and he would be remiss to say or think otherwise.  But there is much more to Mr. Levashov than the allegations against him. Throughout his life he was never motivated by evil or by malice.  He is a man that has tried to do the right things but was caught up in a lifestyle that did not reflect his fundamental morals and characteristics.

Mr. Levashov spent his life working hard and caring for those people closet around him.  As perfectly put by a former neighbor, in a "critical moment" Mr. Levashov does "the right thing" because is a "good person."[8]   At the time she experienced Mr. Levashov's random act of kindness, although on its surface may have been superficial, left a longstanding impression upon her because it was "rare for people who don't know each other to help each other like that."[9]  It is no surprise that the worlds reliable, kind, and sympathetic pour from the letters submitted on his behalf, shedding light on Mr. Levashov's genuine value.  Simply put, Mr. Levashov is

---

[7] Nikita Volchek letter.
[8] Evgenia Pavlovna Karavaeva letter.
[9] *Id.*

12

a good person.

Born in 1980 as the only child of Yury and Galina, Mr. Levashov was raised in Saint Petersburg, Russian during the height of communist rule.  There was a food shortage.  His family lived in depressed and minimal standards of living; they were always looking to make ends meet.  New cloths, nutritious meals, and entertainment, such as watching movies, were scarce and considered a luxury.  Despite his father's excessive alcohol abuse when Mr. Levashov was growing up, his father was one of his best friends.

When his father was ultimately diagnosed with cancer, Mr. Levashov was devastated.  He was on the verge of losing his best friend.  Mr. Levashov took it upon himself to organize his treatment, talk to doctors, set up hospital visits.  He found experimental treatment abroad and stood by his side the entire time.  "Unfortunately, the huge hopes for treatment did not come true and [his father] was gone, but . . .[his father] was happy and proud to have such a caring son."[10]  Mr. Levashov, however, "has had [those] wonderful trait[s] in his character since childhood."[11]

Mr. Levashov has always "had a strong inner need for new knowledge."[12]  He "was constantly striving for something new."[13]  When Mr. Levashov was grade school, he made a decision on his own, "without the help of his parents" and "decided to move

---

[10] Frolova Yulianna Yurievna letter.
[11] *Id.*
[12] Biterakov Alexey Andreevich letter.
[13] *Id.*

to another school with advance studies in physics and mathematics."[14]   He understood the need for education in achieving a life for himself and his future family. He did not want his child to have the same economic upbringing that he did; he had nothing.    Mr. Levashov ultimately graduated from St. Petersburg Technical University, at the top of his class, with masters' degrees in computer engineering and economics.

To that end, Mr. Levashov learned the value of hard work at an early age. When he was fifteen years old until he was eighteen years old, Mr. Levashov performed "odd jobs" such as painting houses and completing small construction projects. Upon starting his studies at university, Mr. Levashov worked as a system administrator for a transportation company earning a mere $300 a month. Nevertheless, Mr. Levashov was "a very goal-oriented person, talked a lot about his work and aspired for career advancement."[15]

After graduating from university, Mr. Levashov married his first wife, Natalia. Although their marriage was short-lived because of his ex-wife's adultery, their divorce was a blessing in disguise.  In 2007, Mr. Levashov met Maria at a mutual friend's wedding.  It "was love at first sight."[16]  He has since reflected that "if he hadn't met Maria, his life would have had no meaning."[17]  After two months of dating, he asked her to marry him every three to four months, until she ultimately said yes.

---

[14] *Id.*
[15] Ivanov Anton Mikhailovich letter.
[16] Yulia Makhailovna Strekozova letter.
[17] *Id.*

"[F]amily was important to him[,]" so when they got married in 2009, Mr. Levashov treated Maria's "friend and relatives with understanding and goodwill."[18] Mr. Levashov "was always approached for advice and help even people he didn't know very well.  As she remembers:

> Together we went through a lot of difficult moments.  My grandfather was very sick (he had lung cancer) and [Mr. Levashov] brough him to another city and installed an air conditioner, so that it would not be so hard for grandfather to breath in the summer.  When grandfather became suddenly ill, we were in Estonia at the time, we quickly packed up and drove to Russia, although it was night and it was snowing heavily.  It took [Mr. Levashov] six hours to drive[.][19]

This was occurring during a turbulent time in his own life, as at the same time, Mr. Levashov's father was battling cancer.  As their lives went on, things did not get easier:

> In January 2013, our son was born.  [Mr. Levashov] took care of me throughout the entire pregnancy, took me to all the doctors and was by my side all the time.  I have a blood disorder, so there was a high risk bleeding.  Our son was born with health problems – he was diagnosed with hydrocephalus syndrome.   Together we took him to all examinations , doctors, procedures and osteopaths.  Out sod did not speak a word until he was three.  We had two courses of rehabilitation, it helped, and at 3 years and 8 months our son started to speak.  All this time [Mr. Levashov] was there for us, he took my child to the doctors, paid for all of the treatment, and calmed me down. [20]

It was shortly after things started looking up for their family, that Mr. Levashov was arrested in Spain.  Spanish law enforcement officers raided their apartment with machine guns and kept not only Mr. Levashov, but his wife and child

---

[18] Maria Anatolievna Levashova letter.
[19] *Id.*
[20] *Id.*

detained. The experience was one that has manifested itself in their mental and physical health. Aside from the general anxieties that family experience in such difficult situations, Maria "started having severe neurosis and insomnia."[21] Shortly thereafter, their son, "on the basis of the strong stress, began autoimmune disease – acute spontaneous urticaria. For 1.5 years [he] was covered with huge red itchy spots, and his face and throat began to swell. Twice [they] ended up in the hospital. To this day, [their] son takes antihistamines, and [his wife] carr[ies] syringes of prednisolone in case of an aggravation."[22]

Mr. Levashov "is an excellent husband and father."[23] He "always knows how to be supportive and find the right words."[24] These qualities have shown through notwithstanding the difficulties Mr. Levashov and his family have faced the past four-and-a-half years. Despite being imprisoned halfway across the word, Mr. Levashov "found the strength to support  [his wife] and give [her] confidence that [their] nightmare would soon be over. He called [them] every day, helping with advice both on work and in general."[25] No matter what he was facing, his family's problems were equally, if not more, important.

And this is a common theme seen throughout the character letters submitted on his behalf. No matter what Mr. Levashov wasgoign through in his life, he always

---

[21] *Id.*
[22] *Id.*
[23] Yulia Mikhailovna Strekozova letter.
[24] *Id.*
[25] Maria Anatolievna Levashova letter.

was always exhibited "honesty, reliability, kindness and the ability to support."[26] He is "a very kind and understanding person who is always ready to help.  Over so many years there have been many events that can confirm these words."[27]  But now, in his time of need and vulnerability, he asks this Court to consider such acts that were unknown to all but a few people until this point, because "surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-14 (2d. Cir. 2006).

Mr. Levashov clearly regrets his action in this case.  Coping with these situations is never easy, but for someone as prideful and humble and Mr. Levashov, it is that much more difficult.  He is generally a "cheerful, positive"[28] person, but the last four-and-a-half years have weight on him heavily.  The shame he has brough upon himself and his family is truly the greatest punishment he can face.  Since this case has come to fruition, Mr. Levashov has felt and expressing feeling of despair, remorse, and disappointment over his actions.  The conduct which Mr. Levashov has personally embraced openly and candidly is not emblematic of his character, but a Scarlet Letter he must now bare.  Nevertheless, Mr. Levashov has clearly accepted responsibility for his actions and intends on continuing to live his life as the person

---

[26] Nikita Volchek letter.
[27] Yulia Mikhailovna Strekozova letter.
[28] Renat Anasovich Fakhrutdinov letter.

everyone believed him to be.

### C. RECIDIVISM, DETERRENCE, AND OTHER POLICY CONSIDERATIONS

Mr. Levashov will never see another courtroom again. As a first time, non-violent offender, with a significant role in his family, a long history of education and employability, no criminal history, and full acceptance of responsibility, there is nothing to suggest that Mr. Levashov poses any threat or risk of committing another criminal offense. *See United States v. Roth*, No. 05 CR 792-5, 2008 U.S. Dist. LEXIS 19603, at *7 (N.D. Ill. Mar. 11, 2008 (departing downward to sentence of probation where defendant posed no risk of recidivism based on lack of criminal history). The character letters submitted on behalf of Mr. Levashov conclusively demonstrate the aberrant nature of his conduct that landed him before this Court; they discuss not only Mr. Levashov's genuine remorse, but also the unlikelihood to commit future crimes. As evidenced by these letters, the past several years has weighed heavily on Mr. Levashov. He has been locked away, on the other side of the world, in a country where he has no one to support him through the most difficult times. The emotional toll these proceedings have taken on Mr. Levashov, and more importantly his family, are tremendous and cannot be overlooked. To Mr. Levashov, the shame and embarrassment surrounding the current conviction is enough to deter him from any future criminal acts. *See United States v. Edwards*, 595 F.3d 1004, 1015-17 (9th Cir. 2010) (upholding below guidelines sentence of probation for bank fraud, a downward variance from a guideline range of 27-33 months, because the sentencing judge adequately addressed the § 3553(a) factors finding that he did not pose a threat of

recidivism despite a previous felony conviction for a similar offense, a term of imprisonment was not needed for specific or general deterrence, and the defendant did pose a threat to the public from re-offending).

More telling of his character, Mr. Levashov quickly accepted responsibility in this matter and demonstrated levels of contrition and retribution that have been unparallel and unprecedented.  This will be further discussed at the sentencing hearing before this Court at great length.  This will undoubtedly be a significant aspect of consideration for this Court prior to imposing its sentence.

It is clear from the letters of support, his personal history and characteristics, and the circumstances surrounding his conviction, that Mr. Levashov will not engage in unlawful behavior in the future – one of the primary factors, which must be considered, under § 3553(a).  According to § 3553(a)(2), an appropriate sentence should "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant."  While a sentence must reflect the seriousness of the offense and provide for adequate deterrence, the effect on Mr. Levashov resulting from his conviction will ensure that the purposes of sentencing, deterrence, and respect for the law will still be fully vindicated if this Honorable Court imposes a significantly below-guidelines sentence. Such a sentence would not deprecate the seriousness of the offense and would provide adequate specific and general deterrence. *See Gall*, 552 U.S. at 54.

A significantly below-guidelines sentence will suffice to not only deter Mr. Levashov from future crimes but will serve as a deterrent to all potential offenders.

*See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006), *aff'd mem.*, 301 Fed. Appx. 93 (2d Cir. 2008) ("But as to [general deterrence], there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white-collar' offenders") (citations omitted); *see also* U.S.S.C., *Fifteen Years of Guidelines Sentencing* 56 (2004) (Sentencing Guidelines were written, in part, to "ensure a short but definite period of confinement for a larger proportion of these 'white-collar' cases, both to ensure proportionate punishment and to achieve deterrence").

### D. A Sentence of Time-Served Will Be Just Punishment

This Court is inherently tasked with an incredibly difficult decision as to what a just punishment is for any given defendant. Chief Justice John G. Roberts Jr., 2016 Year-End Report on the Federal Judiciary 5 (2016) ("Most district judges agree that sentencing is their most difficult duty. In delivering the sentence, the judge speaks as the voice of the community."). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of sentencing as set forth in § 3553(a)(2) . *United States v. Reyes*, 764 F.3d 1184, 1198 (9th Cir. 2014) (internal citations omitted). Through this "parsimony provision," the Court is to impose a sentence that is the *minimum* necessary to accomplish those goals set forth in paragraph (2). As a first-time, non-violent in nature, a sentence less than the 84 months requested by the government would, without a doubt, meet the goals of sentencing. *See* 28 U.S.C. § 994(j), *amended (this section unaffected)* by PL 11-273, Oct. 12, 2010, 124 Stat 2858 (noting that even

probation is an appropriate sentence for "cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," reserving imprisonment for "a person convicted of a crime of violence that result[ed] in serious bodily injury").

In making its determination for Mr. Levashov's appropriate sentence, this Court must consider his non-existent criminal history. As someone who has never been subjected to a term of imprisonment (nor ever arrested or charged with a crime), any incarceration will undoubtedly have a severe impact on Mr. Levashov, certainly more so than someone previously subjected to imprisonment. *See United States v. Paul*, 239 Fed. App'x. 353, 354 (9th Cir. 2007) (vacating defendant's 16 months' imprisonment for theft from a local government receiving federal funds, in part because the defendant "was a first-time offender with absolutely no criminal record whatsoever."); *see also United States v. Ressam*, 679 F.2d 1069, 1098 (9th Cir. 2012) (Reinhardt, J., concurring) ("Similarly, a significant factor in determining the appropriate length of a sentence for those committing criminal offenses is ordinarily their past criminal history. What is a reasonable sentence for a first-time offender will often be unreasonable for a defendant with a lengthy criminal record, and vise-versa."); *United States v. Baker*, 445 F.3d 987, 990-92 (7th Cir. 2006) (upholding downward variance based on the fact that "a prison term would mean more to [a defendant who has never been incarcerated before] than to a defendant who previously has been imprisoned"). And while the sentencing must reflect the seriousness of the offense in an effort to deter others from committing similar

offenses, Mr. Levashov's sentence should not be one that is merely used as an example for others. The fact is that people have, and will continue to commit crimes, whether cybercrime or not. Thus, while general deterrence is important, it should only be a small consideration in this Court's sentencing considerations.

Furthermore, Mr. Levashov's status as an individual subject to removal proceedings, while in the custody of the Department of Homeland Security and U.S. Immigration and Customs Enforcement (ICE), can and should be considered by this Court in imposing sentence. *See, e.g., United States v. Arowasaye*, 112 Fed. Appx. 528, 532 (7th Cir. 2004)("the district court possessed the authority to depart downward based on [defendant's] status as an alien deportable to Nigeria who faces an additional term of incarceration there that is not accounted for[.]"). Similarly, in *United States v. Ngatia*, the Seventh Circuit relied on a reduced need to incapacitate a deportable alien in affirming a below-guideline sentence. *Id.*, 477 F.3d 496, 502 (7th Cir. 2007). At the end of his sentence, Mr. Levahov would be subject to removal from the United States and will likely endure additional incarceration prior to deportation. This "additional term of incarceration which is unaccounted for in the sentencing guidelines can and should be considered by this Court in arriving at a fair and just sentence. To that same end, while many individuals sentenced post-First Step Act will receive additional days of time credit (10-15 days for every 30 days served for eligible prisoners who successfully participate in recidivism reduction programs or productive activities), Mr. Levashov would not be able to benefit from this change in the law because of his immigration status in his country. *See* FIRST STEP ACT, S.

756, Sec. 3632(d)(4)(E) ("Deportable Prisoners Ineligible to Apply Time Credits").

Mr. Levashov is not a violent or evil-minded criminal who poses a dangerous threat to society.  He is a first-time offender with absolutely no criminal history who not only accepted responsibility for his actions but has exhibits levels of contrition and remorse that are uniquely extraordinary and previously unmatched .  For well-over four years, Mr. Levashov's entire life has been consumed by his wrongdoings, the ripple-effects of which have been felt dearly by the ones closest to him.  While retribution is warranted in the instant matter, a further term of imprisonment will deviate beyond the purposes of sentencing,

Mr. Levahov makes no effort to deprecate the seriousness of this offense and understands the need for retribution.  Nonetheless, any sentence near the advisory guideline range goes beyond what is necessary to accomplish the purposes of sentencing, particularly given the unique circumstances of this case.  The necessary term of imprisonment has already been accomplished through the time Mr. Levashov has served.  And although the seriousness offense is not in question, the totality of the crime when juxtaposed against the considerations outlines above weight in favor of compassion and leniency.

## CONCLUSION

This Court maintains significant discretion to not only craft a reasonable, appropriate sentence pursuant to the Guidelines, but to consider the totality of circumstances surrounding the individual involved, including, among other factors, Mr. Levashov's personal history and characteristics and full consideration of his

unmatched acceptance of responsibility.  Without a doubt, Mr. Levashov has certainly appreciated the seriousness of his conduct.  The foregoing considerations outlined in this submission only show a small portion of who Mr. Levashov really is: a proud and dedicated father, son, relative, and friend.

Indeed, Mr. Levashov has made poor choices in his life.  He is truly apologetic for his actions and wants nothing more than to get past this hurdle of his life and be the person those closes to him know him to be.  The conduct that placed him before this Court, although serious, is not a reflection of a fundamentally evil-minded individual.  Rather, it was a confluence of poor judgment and lapse in character.  In sentencing Mr. Levashov to the most lenient sentence permissible under the law, this Court would accomplish the goals of sentencing by punishing the individual – not the crime – to a sentence that is sufficient, but not greater than necessary.  *See Pepper*, 131 S.Ct. at 1240.

Respectfully submitted,

VADIM A. GLOZMAN
Counsel for Peter Levashov

_____/s/  Vadim A. Glozman_____
LAW OFFICES OF VADIM A. GLOZMAN
Federal Bar No. phv09577
53 W. Jackson Blvd. Suite 1410
Chicago, Illinois 60604
Tel: (312) 726-901
