UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PETER YURYEVIC LEVASHOV.<br>*a/k/a* Peter Severa | 17-CR-00083-RNC<br>**EMERGENCY MOTION**<br>TO ADJOURN SENTENCING BEFORE COMPLETING RESTITUTION SO MOVANT COHEN MAY SHOW HIS HIS RIGHT TO RESTITUTION, OR EQUAL RELIEF BY ALLOWING HIM 90 DAYS, 18 USC § 3664(A)(5), TO SHOW IT AND AMEND THE RESTITUTION ORDER |

## INTRODUCTION

Though part of English law for centuries, only in 1982 did Congress by the Victim and Witness Protection Act[1] authorize a federal court to order restitution at sentencing, in its discretion. In 1996, the Mandatory Victim Restitution Act[2] made such orders *mandatory* in some cases, but had no means for a victim who felt he should have got such an order but did not to enforce the requirement.[3] Finally, in 2004, the Crime Victims' Rights Act[4] allowed victims so aggrieved to petition the sentencing court for an order, to be taken up forthwith, and if it failed, to seek immediate appellate review of a petition for writ of mandamus (to be decided by appellate standards), directed to the recalcitrant lower court.

Rafael Cohen, a CVRA/MVRA victim of defendant, petitions for restitution. But, because the government told him that he and others similarly situated were not covered victims of defendant, at least for this case, that controversy must be resolved in his favor before the Court can take up his request for restitution. As it is unlikely the government will concede their victim statuses, and with it their error, *he now seeks only this relief, on an emergent basis*, good cause shown:

1. That he and counsel if not already be allowed to see the sentencing by Zoom
2. That whatever other disposition of sentencing is had, issues of restitution and whether Cohen is a victim entitled to and if so in what amount shall be adjourned, kept open, or ordered open to amendment for 90 days per 18 USC § 3664 so they are resolved with due process by Fatico or other means.

---

[1] VWPA, § 3771..

[2] MVRA, 18 USC § 3663A

[3] Federal judges are without authority to defy Congressional sentencing directives. 242 US 27 (1916).

[4] CVRA, 18 USC § 3771, and therein § 3771(a) (enumerating rights), § 3771(d)(3) (procedures for petitioning))..

## FACTUAL BACKGROUND

*Preface*

Now, the posture of this case is unusual: it exists now with a publicly available unredacted plea transcript; publicly available unredacted plea agreement; and other documents the crux of which is that few facts are capable of dispute because of the government's and defendant's evidentiary admissions.[5] For example, counsel uses the government's and defendant's own words to explain the nature of defendant's decades-long criminal scheme to misuse Internet messaging for criminal gain. As these are what the government and defendant have represented to this court as true, explicitly and by stipulation of offense conduct implicitly, have put before the Court as true, they must be taken so.

Accordingly, any evidentiary proceeding necessary to resolve the issue of restitution are likely able to be satisfied entirely by notice to admit or interrogatory, because all the relief hereby requested and that is necessary for now is simply the right of Mr. Cohen to have such due process available to resolve the issues as the government should have, but apparently did not, itself employ.

*Defendant's Decades-Long Criminal Scheme to Sell His*
*Services of Abusing Internet Messaging to Further the*
*Perpetration of Fraud, Specifically Including, Without*
*Limitation, "Pump-and-Dump" Penny Stock Fraud*

This is taken verbatim (except for the additional material added in square brackets and material elided by ellipses] from defendants' Stipulation of Offense Conduct, ECF 112 @ 15:

> Since the late 1990s until his arrest on April 7, 2017, the defendant Peter Levashov operated botnets under various aliases, most notably "Peter Severa". His botnets, which included the Storm, Waledac, and Kelihos botnets, (a) harvested personal information and means of identification (including email addresses, usernames and logins, and passwords) from infected computers; (2) disseminated spam; and (3) distributed malware, including Trojans and ransomware. Over the course of his criminal career, Levashov participated in and moderated various online criminal forums on which stolen identities and credit cards, malware, and other criminal tools of cybercrime were traded and sold…

---

[5] There seems no reason to make a formal motion for this Court to take judicial notice of its own documents in this case, but if necessary, counsel respectfully asks that such a motion be deemed to have been implicitly made herein.

2

> Levashov advertised [that at least] his [Kelihos] botnet's services on various on-line forums and customers would knowingly pay him to distribute spam and other malware, including ransomware…
>
> In furtherance of the conspiracy and to affect the objects of the conspiracy, Levashov and his co-conspirators committed and caused to be committed the following overt acts, among others, in the District of Connecticut and elsewhere:

There follow divers statements of certain criminal conduct taken in and after 2016, of which little is relevant here save for this, at ECF 112 @ 16:

> Some of the sparn that Levashov distributed contained advertisements in furtherance of "pump and dump" schemes, which sought to boost the price of various stocks through recommendations based on false statements. For example, on March 22, 2017, for the purpose of executing and attempting to execute a pump and dump scheme and with the intent to defraud, Levashov caused a wire to be sent via a chat platform from outside of Connecticut to an individual in Connecticut.

*Cohen's $425.000 Loss to a "Pump-and-Dump" Stock Fraud in 2005 – 2007 Propagated by the Storm Botnet*

Between 2005 and 2007, Mr. Cohen, in reliance on emails he received which appeared to be legitimate but were in reality the product of a pump-and-dump scheme and which contained false and misleading information promoting certain stocks, including, significantly, WWBP, which Mr. Cohen was led to buy in reliance on the fraud, subsequently losing all his money when they became worthless.

In 2007, the government prosecuted the co-conspirators in this scheme, including, most prominently, Alan Ralsky, head of the "pump and dump" side, and Peter Severa [sic], the head of the "spam" propagation side. Levashov has of course admitted that Severa is his alter ego, a name he has used in the past. See *supra*. This is from the Stipulated Facts section of Ralsky's guilty plea in the case:[6]

> From on or about May 2005 through on or about September 2005, defendant ALAN M. RALSKY ("RALSKY" or "defendant") conspired and agreed with Scott Bradley, Francis Tribble, Judy Devenow, How Wai John Hui, and others to send unsolicited bulk commercial electronic mail ("spam"), sent spam emails himself, and also managed other mailers who sent spam on behalf of the conspiracy. During this time frame, the defendant served as a supervisor/leader in his role as the chief executive officer and primary deal maker for the spam email operation. He transmitted and caused others to transmit tens of millions of spam emails that used false headers and that were sent via proxy mailing, in order to disguise the true origin of the spam emails and prevent

---

[6] *United States of America v. Ralsky*, (E.D. Mich. 2007).

recipients and Internet service providers from detecting and blocking them. The term "proxy mailing" means knowingly using protected computers to relay or retransmit the messages with the intent to disguise their origin. The term "false headers" means knowingly and materially falsifying header information and intentionally initiating the transmission of multiple commercial e-mail messages. Many of the spam emails promoted thinly traded stocks for Chinese companies, including those with the ticker symbols CDGT, WWBP, CWTD, and PGCN, and contained materially false and misleading information or omissions. The defendant was aware that interstate wire communications, the U.S. mail, and common carriers were used to further the fraudulent scheme, which resulted in the defendant and others receiving payments and proceeds from the sale of stocks whose prices were inflated after being promoted by spam email sent in furtherance of the conspiracy.

This is from the original indictment in the case (Severa/Levashov was never prosecuted as he was apparently hiding in Russia and effectively immune to arrest and extradition). There are very many similar charges and allegations all describing Severa as the "propagate email through botnets" person, too many to be included here; one should suffice:

> From on or about January 1, 2004, through September 2005, and continuing !hereafter to on or about September 2007, in the Eastern District of Michigan and elsewhere, defendants ALAN M. RALSKY, SCOTT K. BRADLEY, JUDY M. DEVENOW, JOHN S. BOWN, WILLIAM C. NEIL, ANKI K. NEIL, JAMES E. BRAGG, JAMES E. FITE, PETER SEVERA, HOW WAT JOHN HUI, and FRANCIS A. ("FRANKIE") TRIBBLE, and other persons both known and unknown to the Grand Jury, were engaged in an unlawful spam e-mail operation that was conducted through the commission of several federal criminal offenses, including, Conspiracy, in violation of 18 U.S.C. § 371, Fraud in Connection with Electronic Mail, in violation of 18 U.S.C. § 1037, Computer Fraud, in violation of 18 U.S.C. § 1030, Mail Fraud, in violation of 18 U.S.C. § 1341, Wire Fraud, in violation of 18 U.S.C. § 1343, and Money Laundering, in violation of 18 U.S.C. §§ 1957 and 1956(h).
>
> The defendants employed several fraudulent means to accomplish the common goals of sending out as much unlawful spam e-mail as possible in order to make as much money as possible, either through marketing products and services or through causing spam recipients to buy certain shares of stock, which would cause the price of the stock to increase and allow the defendants and their cohorts to sell the stock at an inflated price, resulting in millions of dollars of proceeds to the defendants. The fraudulent means included: registering domain names with false information to avoid detection; inserting false e-mail headers to hide their true identity; using "proxy computers" to disguise the source of the spam e-mail; e-mailing stock advertisements that contained false and misleading information; and attempting to set-up a bot network to send unlawful spam e-mail. In furtherance of this scheme, defendants caused millions of unlawful spam e-mails to be sent and earned millions of dollars from selling stock at inflated prices…

On or about June 27, 2005, defendant BRADLEY communicated with SEVERA by online chat, and defendant SEVERA stated he could get 20 million e-mails a day into "AOL" or "hotmail." Defendant SEVERA agreed to send spam on behalf of the defendants touting stock ticker symbols G:rWD and PGCN. When defendant BRADLEY told defendant SEVERA to contact his "busine~ part~~„ ALAN RALSKY, defendant SEVERA responded: "King of Spam want to rent me. Cool."

*The Sole Reason Given by the Government*
*For Its Denial of Victim Status Is This Email*
*And an Earlier One Substantially the Same*

Date: 07.30.29

From: Vanessa

Dear Attorney Oberlander:

I write concerning your client Rafael Cohen, who has recently contacted the U.S. Attorney's Office directly with questions concerning United States v. Levashov, 3:17CR83 (RNC), regarding his status as an alleged victim and about restitution. As I mentioned to you on the phone several months ago, under the law, it appears that your client would not be entitled to restitution from Mr. Levashov because Mr. Levashov was charged with and pled guilty to crimes that post-date the time period in which Mr. Cohen was allegedly victimized. For the same reasons, your client was not notified or consulted before Mr. Levashov's guilty plea in this case. Nonetheless, we hope that any concerns Mr. Cohen may have had concerning the plea were mitigated by the fact that Mr. Levashov pled to the highest offense charged and admitted to conduct well beyond that charged in his plea agreement stipulation.

## ARGUMENT

The government employed the concept of a *temporal bar* to deny Cohen's victim status (if he is not eligible for restitution in the ordinary course because of a temporal bar, it is hard to see how he could be a victim for other purposes; how is one injured no matter how remote in time by commission of a crime and so a victim but not entitled to restitution if the injury was too remote in time).

This is not the law, and while it may at one time in some circuits have been the law, it most emphatically is not the law in the Second Circuit at this time:

> The [1990] amendment[7] is widely viewed as partially overruling *Hughey's* restrictive interpretation of the VWPA and expanding district courts' authority to grant

---
[7] In 1990, the Supreme Court interpreted the VWPA to allow restitution only for the crime of conviction (roughly), and Congress quickly overruled that by amending the statute that same year. It was of course some years until the MVRA came

5

restitution. *See United States v. Kones*, 77 F.3d 66, 69 (3rd Cir. 1996); *United States v. Broughton-Jones*, 71 F.3d 1143, 1147 n.1 (4th Cir. 1995). The majority view is that the 1990 amendment "did have a substantive impact on the amount of restitution a court could order when a defendant is convicted of an offense involving a scheme, conspiracy, or pattern." *United States v. DeSalvo*, 41 F.3d 505, 515 (9th Cir. 1994). Federal courts therefore now allow broader restitution orders encompassing losses that result from a criminal scheme or conspiracy, regardless of whether the defendant is convicted for each criminal act within that scheme. See, e.g., *United States v. Manzer, 69 F.3d 222, 230 (8th Cir. 1995)*. The harm must be a direct result of the defendant's criminal conduct, though, or "closely related to the scheme." *Kones*, 77 F.3d at 70.[8]

The Second Circuit is, if anything, even more clear:

Renee Suki Sang appeals from the district court's restitution award in the amount of $59,551.08 after pleading guilty to larceny. Sang, who participated in a scheme to withdraw money from her bank account after a friend deposited a fraudulent $60,000 check, argues that the district court was required to accept as true the statement she made during her allocution that she did not form an intent to steal until approximately $10,000 remained in her account. She argues that the district court looked beyond the conduct underlying her offense of conviction by ordering restitution in the full amount of her withdrawals. The district court found that Sang's intent, which it described as "classic conscious avoidance," was formed much earlier, such that she should be responsible for the full amount of her withdrawals for the purpose of restitution. We presume the parties' familiarity with the facts and procedural history of this case...

In *Hughey*...the Supreme Court held the language and structure of the Victim and Witness Protection Act (the "VWPA") "ma[de] plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." The Mandatory Victim's Restitution Act (the "MVRA") states that when a defendant is convicted of "an offense against [**3] property," the court "shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A. In *United States v. Oladimeji*, 463 F.3d 152, 157-58 (2d Cir. 2006), we extended the holding of *Hughey* to the MVRA. Pursuant to § 3663A(d), all restitution orders under the MVRA must comply with the requirements of 18 U.S.C. § 3664...3664(e) provides that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by...preponderance of the evidence," and we have...held that "under the precedents set by *Apprendi*, *Blakely*, and *Booker*, the Sixth Amendment does not bar a...court from imposing a restitution order...on findings it has made by a preponderance..." Oladimeji, 463 F.3d at 157 (citing *United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006)).We find no abuse of discretion in the...court's restitution award or clear error in its...findings. [T]he...court knew...Sang was a cashier with...income of $2,200 and..."no dummy." [O]n these observations, the ...court termed Sang's failure to question the $60,000 deposit "classic conscious

---

into existence in 1996, which was also subsequently amended to add language for such breadth of award substantially identical to the language added to the VWPA in 1990. This decision considers that to mean that whether under the VWPA or MVRA, a restitution award may be entered for all losses however remote directly connected to the scheme.

[8] *United States v. Lomas*, 392 Fed. Appx. 122, 126 (quoting *United States v. Henoud*, 81 F.3d 484, 488 (11996)).

avoidance" and noted…"restitution . . . [was] appropriate in the full amount of what [Sang] had…reason to believe was at risk." Sang's statement at her allocution that she only formed…intent when less than $10,000 remained in her account is…one piece of evidence … the…court weighed, and it was…within its discretion to find …[her] responsible for the full amount of…withdrawals…Sang correctly assert…the…court may not consider conduct outside…the offense for…calculating a restitution…the court did not…[but] concluded…she was responsible for the full withdrawals.

A ruling in Sang's favor could provide an incentive to other defendants to attempt to limit restitution awards unilaterally by testifying at their plea allocutions to the bare minimum that would constitute a sufficient plea. Not only would such a ruling be in contravention of the district court's ability to make restitution findings by a preponderance of the evidence, it would also conflict with the "primary and overarching purpose of the MVRA [which] is to make victims of crime whole."[9]

Finally, consider the Sang court's analysis of a Fifth Circuit case which had applied a doctrine one may think of as, "Did the parties to the criminal case reach an understanding at allocution that superseded (narrowed or expanded) the scope of crime stated in the indictment:"[10]

> In *United States v. Adams*, 363 F.3d 363, 367 (5th Cir. 2004), the Fifth Circuit held that a defendant's statement during a plea allocution narrowed the scope of his offense of conviction (and…limited his restitution obligations) because the parties had reached a "mutual understanding" as to the relevant facts. We need not decide whether we would endorse a similar rule…because there was no "mutual understanding" in this case, and unlike in Adams, there was no plea agreement between the parties.

---

[9] *United States v. Sang*, 512 Fed. Appx. 103 (2013).
[10] *Id.* at n. 2.

7

## CONCLUSION

The government has misapplied law which if it ever was applicable here ceased to be so some 20 years ago by modification of the MVRA concept of the scope of criminality for which restitution may (thus must) be ordered. And in this case in particular it could not be more clear that even the parties themselves knew full well that all of Levashov's criminal conduct, at least as related to hiring himself out to use various devices to blast out emails containing fraudulent misrepresentations of the value of secretly manipulated stocks pursuant to various pump-and-dump rackets, starting no later than 2005 with such methods and means used to defraud Cohen and according to the documents filed here 2017 if not later where the same such methods and means were used in another pump-and-dump racket. Obviously, that Levashov knew of those rackets makes the injury suffered all the more part of that which this Court must hold him responsible. In sum, this is a decades-long single scheme at least as to Levashov for which the MVRA requires restitution to all victims however remote in time. Thus Cohen moves this Court to deem this as a § 3771(d)(3) filing to enforce his right and a a § 3771(d)(5) filing to the same effect, however done, whether by concluding sentencing but ordering that Cohen have up to 90 days to establish his victim status and then establish his right to a restitution order, and if he does the Court will amend any restitution order it now issues at sentencing; or, in the alternative, to adjourn sentencing as to restitution before it is done, for the same period of time and same purpose.

*****

This document was prepared with the assistance of noni-appearing counsel

*****

The undersigned swears under penalty of perjury, 28 USC § 1746, that all facts alleged herein are true to his best knowledge.

/s/ *Rafael Cohen*
Petitioner *pro se*
Rafael & Associates,Co.
345 N. La Brea Ave.,Suite 206.
Los Angeles,Ca 90036
Dir # 323-456-1455
Fax # 323-456-455-1456

8