

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - -X

UNITED STATES,

                    Plaintiff,     3:17-cr-00083-RNC

v.                                July 20, 2021

PETER LEVASHOV,

                    Defendant.

- - - - - - - - - - - - - - - -X



SENTENCING HEARING

*VIA VIDEOCONFERENCE*


Held Before:
      The Honorable Robert N. Chatigny. U.S.D.J.




            FALZARANO COURT REPORTERS, LLC
                  4 Somerset Lane
                Simsbury, CT 06070
                  860.651.0258
            www.falzaranocourtreporters.com

```
 1                      APPEARANCES

 2

 3      REPRESENTING THE GOVERNMENT:

 4      UNITED STATES ATTORNEY'S OFFICE
        157 Church Street
 5      New Haven, CT 06510
        (203)821-3700
 6      edward.chang@usdoj.gov

 7      By:  AUSA Edward Chang        ** via videoconference

 8

 9

10      REPRESENTING THE DEFENDANT:

11      LAW OFFICES OF VADIM A. GLOZMAN
        The Monadnock Building
12      53 W. Jackson Boulevard, Suite 1410
        Chicago, Illinois 60604
13      (312)726-9015
        vg@glozmanlaw.com
14
        By:  Vadim A. Glozman, Esq.   ** via videoconference
15

16

17

18      ALSO PRESENT:

19      Leonid Chekin, Interpreter

20      Anotoliy Puzanov, Interpreter

21

22

23

24

25
```

```
1                      (Commenced at 2:05 p.m.)

2           THE COURT:  Good afternoon.  This is the sentencing

3   hearing in the Levashov case.  May I please have the

4   appearances of counsel?

5           THE CLERK:  Attorney Chang, I think you're muted.  I'm

6   going to ask you to unmute now.

7           MR. CHANG:  My apologies, Your Honor.

8           Good afternoon.  This is Edward Chang for the United

9   States, and with me at counsel table is FBI Special Agent Mike

10  Morrison.

11          SPECIAL AGENT MORRISON:  Good afternoon, Your Honor.

12          THE COURT:  Good afternoon.

13          MR. GLOZMAN:  Good afternoon, Your Honor.  Vadim

14  Glozman on behalf of Peter Levashov, who is present on Zoom.

15          THE COURT:  Good afternoon.  We are joined by one or

16  more interpreters.  And for that reason, I will ask the clerk

17  to please swear in our interpreters at this time.

18          THE CLERK:  Yes, Your Honor.

19                  (Interpreters sworn in by the clerk.)

20          THE CLERK:  Would you both please state your name and

21  the language you'll be interpreting for the record?

22          THE INTERPRETER:  Leonid Chekin, Russian language.

23          THE INTERPRETER:  And I'm Anotoliy Puzanov, Russian.

24          THE CLERK:  Thank you.

25          THE COURT:  Thank you.  We are conducting this hearing
```

1    via Zoom Videoconference at the joint request of the parties

2    and with the consent of the Court.

3          Let me please confirm at this time that the parties

4    continue to prefer to proceed by Zoom rather than await an

5    in-person proceeding at some indefinite point in the future.

6          Attorney Chang?

7          MR. CHANG:  Yes, Your Honor.  That would be the

8    preference of the Government.  Thank you, Your Honor.

9          THE COURT:  Attorney Glozman?

10         MR. GLOZMAN:  Yes, Your Honor.  It is our preference

11   to continue today on Zoom.

12         THE COURT:  Mr. Levashov, is that your wish?

13         THE PLAINTIFF:  Yes, Your Honor.

14         THE COURT:  All right, thank you.  Then let us

15   proceed.

16         Mr. Levashov appears for sentencing today, having

17   pleaded guilty to four counts in the indictment:  Causing

18   intentional damage to a protected computer, conspiracy, wire

19   fraud, and aggravated identity theft.  A presentence report

20   has been prepared by our probation office.

21         Let me ask Attorney Glozman to please confirm that you

22   have received and reviewed the presentence report as

23   supplemented.

24         MR. GLOZMAN:  Yes, Your Honor.  We've received and

25   reviewed the presentence report supplemented and have no

 1   objections.

 2          THE COURT:  Have you had adequate opportunity to go

 3   over the report with Mr. Levashov?

 4          MR. GLOZMAN:  Yes, Your Honor.

 5          THE COURT:  And I take it, as you said just now, that

 6   you have no objections to the presentence report in so far as

 7   the statements of fact are concerned; is that right?

 8          MR. GLOZMAN:  That's right.  Just the guidelines that

 9   we outlined in our submission.

10          THE COURT:  All right, thank you.

11          Mr. Levashov, can you confirm that you have received

12   and read the presentence report as supplemented?

13          THE DEFENDANT:  Yes, I did, Your Honor.

14          THE COURT:  And can you also please confirm that you

15   have had adequate time to review the report with your counsel?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  Are you satisfied that the report is

18   accurate?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  All right.  Mr. Chang, is the Government

21   satisfied that the statements of fact in the report are

22   accurate?

23          MR. CHANG:  Yes, Your Honor.

24          THE COURT:  All right, thank you.  I adopt the

25   statements of fact in the report in the absence of objection.

1          The report includes the section on the way in which

2     the Federal Sentencing Guidelines apply here, and it appears

3     that everyone is in agreement, with the exception of two

4     distinct matters:  The Government is seeking an adjustment of

5     two points under the applicable guideline 2B1.1(b)(10)(B) and

6     (C) because a substantial part of the fraudulent activity

7     occurred outside the United States and, in addition, involved

8     use of sophisticated means.  We can refer to that, I suppose,

9     as the sophisticated means adjustment.

10          The Defense contends that the adjustment does not

11    apply, and thus those two points should not be included in the

12    guidelines calculation.

13          At the same time, the Government believes that two

14    points should be added because Mr. Levashov used special

15    skills that significantly aided the commission or concealment

16    of his offense conduct within the meaning of Sentencing

17    Guidelines Section 3B1.3, and here again Mr. Levashov objects.

18          The presentence report agrees with the Government's

19    position on these two matters, and I have read your papers

20    with regard to your respective positions.  But let me ask you

21    at this time to make whatever additional presentation you wish

22    as to these matters, the sophisticated means adjustment and

23    the special skills adjustment.

24          Attorney Chang?  It's the Government's burden to

25    satisfy the Court that the presentence report correctly

includes two points for each of these matters.  Is there

anything that you would like to add to what you have submitted

in writing?

MR. CHANG:  I don't think so, Your Honor.  I think

that with respect to establishing the burden that the

Government has to meet, I do think the facts underlying the

sentencing advancement that we're seeking here are undisputed.

It's undisputed that Mr. Levashov, for example,

conducted a scheme of computer infections throughout the

United States using infrastructure that was located outside of

the United States, and for that basis, the 2(b)(10) adjustment

is fully warranted.

With respect to his use of a special skill, I believe

that Mr. Levashov would admit that he was, in fact, involved

in developing a code that was used for cyber crimes as well.

As discussed in the Government's papers, some of the

supporting systems, for example, the encrypting that was done

by Encrypt For You.

And on that basis, we believe there is a sufficient

factual basis for the Court to find a special skills

enhancement as well.

THE COURT:  Thank you.

Mr. Glozman, any comments?

MR. GLOZMAN:  Just briefly, Your Honor.  As it relates

to what you call the sophisticated means enhancement, I think

1    one of the uniquenesses of this case was that it was all done

2    on the internet, and the guidelines themselves define this

3    enhancement to mean a physical space.  We know the internet is

4    not a physical space.  It's all just data stored in a cloud,

5    wherever it is stored.  There's no physicality of it.

6          If anything, the crime actually occurred here because

7    this is where the infection happened.  This isn't a case where

8    Mr. Levashov physically mailed something from Russia to the

9    United States; this was all done on the internet.  I think

10   Mr. Chang and Mr. Levashov know much more about the internet

11   than I do.  But it's not a physical location and I don't think

12   it should apply to that.

13         As for the sophisticated means, my main position here

14   is it's not -- you don't look at whether it is sophisticated

15   in and of itself.  You look at whether it's a sophisticated

16   type of crime similar to this, more sophisticated than a

17   typical cyber crime.  I think in this case it's not; because

18   at its core, what Mr. Levashov did was send out mass emails.

19   And that's not more sophisticated than all these other fishing

20   attacks that we read about online.

21         As for a special skill, you know, none of the degrees

22   or anything that Mr. Levashov obtained help in the

23   facilitation.  And if you read the Government's memo, they

24   concede that other people were doing a significant portion of

25   the development of these botnets.

1          So I don't believe that either one of the enhancements

2    they seek apply, at least they haven't met their burden of

3    proof for them.  And so, we ask that you not give Mr. Levashov

4    those two enhancements.

5          THE COURT:  All right, thank you.

6          Mr. Chang, you have an opportunity to reply if you

7    wish.

8          MR. CHANG:  I -- you know, I do think that Mr. Glozman

9    has gotten the sophisticated means argument backwards.  It's

10   not that the crime has to be sophisticated, but that the means

11   of conducting the crime has to be sophisticated.

12         So certainly, sending mass emails is something that

13   somebody could do, but constructing a massive worldwide botnet

14   to do so, I think, falls squarely within the idea of what

15   sophisticated means is intended to govern.

16         So that's that argument.  And with respect to the use

17   of a special skill, I think it's inherent in what was done

18   here that Mr. -- that Mr. Levashov was using his education and

19   background in developing the software in taking the leadership

20   role in paying others to develop the software that was used to

21   create the botnets, as well as, you know, what -- what we know

22   with respect to his work on ancillary services such as

23   encrypting, where he was also working with others to do that

24   as well.

25         So we think that there definitely was the use of

1    special skills by Mr. Levashov in this case.

2         THE COURT:  Thank you.  Having considered the parties'

3    positions, I conclude that the presentence report correctly

4    assigns two additional levels for each of these matters, and I

5    say that for substantially the reasons stated by the

6    Government today and previously in its memorandum.

7         I agree with the Government that the adjustment

8    available to the Government when conduct occurs outside of the

9    United States is available in cyber crime cases such as this,

10   where the individual committing the offense was residing in

11   Russia and used infrastructure outside the United States; and

12   I also agree on the undisputed facts that the offense involved

13   the use of sophisticated means.

14        Again, I think the Government has the better of the

15   argument, as set out in its memorandum.  It is a question, the

16   totality of the circumstances.  And if we look at the

17   circumstances of the offense conduct in its totality, I think

18   it's very difficult to avoid the conclusion that Mr. Levashov

19   used sophisticated means is undisputed:  That he used custom

20   malware, he used command and control servers in different

21   countries, he used bulletproof hosting, he used DPNs, and he

22   also used custom encrypting solutions.

23        He employed these means to build and operate massive

24   botnets, and thus we have a case that is far from a case

25   involving a high school kid who uses off-the-shelf items to

1   counterfeit money.

2          I think that the undisputed facts are sufficient to

3   establish Mr. Levashov's use of sophisticated means; and

4   therefore, two levels are properly applied under Guidelines

5   Section 2B1.1(b)(10).  With regard to the special skills

6   adjustment under Section 3D1.3, I think that the Government is

7   correct that the adjustment applies.

8          Under the guidelines, this two-level enhancement is

9   available if the Defendant used a special skill in a manner

10  that significantly facilitated the commission or concealment

11  of the offense.  The commentary in the guidelines tells us

12  that a special skill is one that is not possessed by members

13  of the general public, and usually requires substantial

14  education, training, or licensing.

15         The commentary offers examples.  It points out that

16  the adjustment could apply in a case involving a pilot, a

17  lawyer, a doctor, an accountant, a chemist, or a demolition

18  expert.  I think it's plain in this case that Mr. Levashov has

19  special skills, and that his skills are on a level that is

20  analogous to the level of skill possessed by a specialized

21  professional such as a lawyer or a doctor.

22         Mr. Levashov has a degree in computer science, and

23  apparently is an exceptionally able computer scientist who

24  used his special skills to develop and operate these notorious

25  botnets.

1          I, therefore, agree with the Government that the

2     adjustment applies.  We're talking about an individual who

3     used his computer science education and expertise to build and

4     operate these botnets over a 15-year period; improving each

5     one in light of his experience, building and operating others,

6     and in addition, he worked closely with the Encrypt For You

7     Group to develop an automated encrypting solution to support

8     the needs of the botnet.

9          So, again, this isn't a case of an individual who

10     simply bought and used off-the-shelf malware.  He built and

11     operated three massive botnets using custom malware that he

12     helped design and build.  And the level of his skill was such

13     as to make it difficult for antivirus software and antispam

14     service providers to respond.  So I adopt that adjustment as

15     well.

16          There is no other objection, as I understand it.  So

17     in the absence of objection, I adopt the calculation set out

18     in the presentence report.  We wind up with a total offense

19     level of 32 in Criminal History Category 1.

20          In concluding that the presentence report correctly

21     calculates the total offense level, I do not need to imply

22     that I think it provides sound guidance to me today in

23     determining what the sentence should be in this case.  I have

24     concerns that the total offense level does overstate the

25     seriousness of Mr. Levashov's crimes and his criminal

culpability.  Of course, his crimes are no doubt serious and he is culpable.  But an offense level of 32 is exceptionally high.  It's reserved for conduct that is truly serious in terms of the harm done by the individual, and I have concerns that in this case Mr. Levashov could think that the harm he was causing did not rise to the level that is commonly seen when a person has a total offense level of 32 under the guidelines.

I have a couple of points that I think I'm bound to raise and discuss with you, because, after all, it is my obligation to make sure that we have thought this through in coming up with the calculation; particularly on the subject of loss.

Mr. Levashov receives an 18-level adjustment on the grounds that the offense involved a loss of approximately $7 million, which would result in an 18-level adjustment under Section 2B1.1(b)(1)(J).

The parties agree that this 18-level enhancement applies, and Mr. Levashov does not object to its application here, based on the parties' papers.  It appears that in the plea agreement and today, the parties are agreeing that $3.5 million, the threshold for application of this 18-level enhancement, is at issue here, either as a reasonable estimate of the actual loss or, alternatively, as admitted gain.  And I don't want to belabor this, but I do think I need to be

1   careful in making sure that there is no misunderstanding.

2          Under the guidelines, loss must be used when it is

3   possible to make a reasonable estimate of the -- a loss.  Gain

4   may be used if there wasn't a loss, but the amount of the loss

5   cannot reasonably be determined.  So I think I need to be sure

6   that I understand your positions.

7          Is it the Government's position that loss is properly

8   used here because $7 million is a reasonable estimate of the

9   actual loss?

10          MR. CHANG:  Your Honor, first, I would start by saying

11   that I didn't negotiate this actual plea agreement.  So

12   that -- I wasn't there at the time.

13          But it's my understanding that the Government is

14   relying both on the loss being in excess of $3.5 million, as

15   well as the gain being in excess of $3.5 million, as the basis

16   for that guidelines application.

17          Now, the loss in a case like this is extraordinarily

18   difficult to determine because while we can fairly easily see

19   the number of computers that were infected with Mr. Levashov's

20   botnet at a specific point in time, it's not necessarily the

21   case that we can determine what each of those computer owners

22   suffered as a loss, and it's only a snapshot in time.

23          So when the Government uses this number of 50,000

24   computers being infected at any given time, that's really

25   undercutting the number of computers that have been impacted

1   over the course of ten or 15 years of this computer crime.

2          On the other hand, the determination of how much each

3   individual computer user loses, in this particular case

4   determination is probably not the -- the $149 number or

5   whatever number was used in the stipulated agreement because

6   it's not as if every one of those computer owners went out to,

7   you know, Best Buy to have their computer fixed.  It's almost

8   certainly not the case, because most computer owners probably

9   just relied on the antivirus software installed on their

10  computers to eventually clean up the virus.

11         So what you have is:  On the one hand, you have a

12  serious underestimate of the number of computers that were

13  involved, and what's probably an overestimate of the dollar

14  loss to each victim.  And the parties negotiated on this and

15  stipulated to the agreement that they would use the number

16  50,000 in terms of the number of computers, and that loss

17  amount of -- I think it was $149 as being a way to estimate

18  the overall loss encompassed by the entire activity.

19         But it's very difficult, really, to come up with an

20  actual loss number in this particular case because -- and this

21  is the second part of it, really -- Mr. Levashov wasn't

22  directly sending out -- you know, for the most part.  I think

23  we're going to discuss in the future, there was some

24  pump-and-dump schemes or ransomware that was being sent out.

25  But for the most part, he wasn't directly involved in an

1    identifiable crime where we could go out and look for victims

2    of a specific ransomware and identify, Okay, this victim paid

3    this much money, that victim paid this much money, and add up

4    those amounts.

5         Instead, what he was was somebody who was offering a

6    service, a spamming service that facilitated a lot of other

7    computer crimes; which makes it harder to identify victims and

8    say, Okay, here comes ABC losses of money.  And that's why the

9    Government and Mr. Levashov negotiated on the loss calculation

10   that is set forth in the stipulation.

11        THE COURT:  Thank you.  Looking at the applicable case

12   law, it appears that the Second Circuit might well agree that

13   persons whose computers were infected, but who incurred no

14   expense could be considered victims under Guidelines Section

15   2B1.1(b)(2), and furthermore would approve a loss calculation

16   that multiplies the approximate number of victims by the

17   average loss to each one, as the parties seem to have done

18   here in negotiating a loss figure, has predicated on the cost

19   to fix a computer infected with the virus, approximately $149

20   per computer.  And so, I can well understand why the parties

21   negotiated as they did to arrive at this figure.

22        At the same time, however, I'm concerned that loss may

23   not be available to us as a basis for this 18-level

24   enhancement because it would be necessary for me to find each

25   and every computer owner whose computer was compromised by the

1    virus that actually suffered an adverse effect that could be

2    measured in monetary terms.

3         I say that in light of the Second Circuit's decision

4    in the *Abioden* case, which is at 536 F.3d 162 at 168-169.

5         It's not apparent to me that any such owner did indeed

6    suffer an adverse effect measurable in monetary terms.  It

7    appears that, as Mr. Chang said, many did not actually incur

8    any expense; and I'm not aware of any adverse effect that

9    would support an 18-level enhancement.

10        Accordingly, I think we should be able to look to the

11   admitted gain, and use that instead.  At the time of the

12   change of plea, the written plea agreement contemplated that

13   the 18 levels would be added based on the amount of the

14   admitted gain.  It was only during the plea proceeding that

15   the plea letter itself was amended to include loss as a

16   possible basis for this enhancement, this 18-level

17   enhancement.  And I think in context, that makes sense because

18   I think that the difficulty of trying to estimate actual loss

19   is such that we should be able to use gain.

20        And so, on that basis, I would agree that the 18

21   levels are properly applied in the presentence report.  That

22   also pertains to the adjustment for the number of victims.

23   Under the Second Circuit Case Law, the number of victims means

24   the number of persons who sustain loss as determined by the

25   loss calculation guideline.  And, you know, one might say,

1    Gee, if you're using gain rather than actual loss, how can you

2    add the adjustment for number of victims?  But I think in this

3    case, for the reasons spelled out in the presentence report

4    and the parties' submissions, it's obvious that at least

5    ten people were subjected to loss as a result of

6    Mr. Levashov's activities over these many years.  And so,

7    notwithstanding the definition of "victims" that I just

8    mentioned, I think that it is entirely fair and reasonable to

9    include an adjustment for more than ten victims.

10        I apologize for spending so much time on the

11   guidelines calculation, but we're obliged to do our best to

12   calculate the total offense level as best we can.

13        Anything further on the guidelines calculation,

14   Attorney Chang?

15        MR. CHANG:  No.  Thank you, Your Honor.

16        THE COURT:  Attorney Glozman?

17        MR. GLOZMAN:  Just the arguments that I'm going to

18   make within the frame of 3553(a); but nothing as to specific

19   enhancements at this time.

20        THE COURT:  Okay, thank you.  Then having covered the

21   guidelines calculation, let me invite you to make whatever

22   additional presentations you wish.

23        Mr. Levashov, you'll have a chance to speak today if

24   you wish.  You don't have to say anything, but the law gives

25   you a right to speak on your own behalf if you want to do so.

1          Attorney Glozman, you're welcome to proceed.

2          MR. GLOZMAN:  I would be remiss, Your Honor, if I sat

3     here today and tried to argue what Mr. Levashov did was not

4     that bad or not that serious.  No matter how you look at it,

5     no matter how you dissect it or try to spin it, the truth is

6     that the crimes Mr. Levashov pleaded guilty to are as bad as

7     they seem.

8          As Mr. Levashov comes before this Court here today, I

9     can assure you there's no one present here today who

10    appreciates the seriousness and the gravity of the situation

11    more than him.  If anything, the last four and a half years

12    since he was first arrested and taken into custody in Spain

13    has done nothing but put his life into perspective:  The life

14    he had, the people he had in his life, and the relationships

15    that he had with them.

16          There has been an attempt to put those relationships

17    and the impact Mr. Levashov has had on other people closest to

18    him in perspective for this Court, or at least as much as

19    possible through the confines of a couple pages, the character

20    letters that have been submitted.

21          And granted, I do not know Mr. Levashov as well as the

22    people who wrote the character letters.  I have come to see

23    those same characteristics that they talk about in him myself,

24    and more.

25          And so, it's with a great deal of apprehension that I

1    try to do this today, not because I lack any confidence in

2    this Court reaching a sentence that is reasonable and not

3    greater than necessary, but because much of what has been

4    known to this Court so far are those actions by Mr. Levashov

5    that I can only describe as being nonconforming to his actual

6    character.

7            Obviously, the Government has not made an effort to

8    commend his virtues, his qualities and the good deeds that he

9    has performed over a lifetime.  By contrast, I have spent

10   countless hours talking to Mr. Levashov and his family over

11   the last three years, and I've seen his gentility and his

12   kindness and his humor at a time that he had no reason to put

13   on an act.  And I have seen his remorse with the situation he

14   has put himself and his family into when there was no reason

15   for him to do so.

16           And my observations have allowed me to juxtapose the

17   sophistication that they're going to make as it relates to his

18   inner naivete and weaknesses and fears that he attempts to

19   hide.

20           The truth is that Mr. Levashov is not an evil person.

21   He is not a person that gains any sort of pleasure from the

22   misfortune of others.  And as you read the character letters,

23   I'm sure it was obvious that if anything, Mr. Levashov prides

24   himself on being a person that people can count in their time

25   of need.  Nor is he a person that lacks the capacity to

1    appreciate the effects of his conduct on not only the people

2    closest to him, but the victims of his transgressions.

3           Instead, he is a person that had found himself at a

4    crossroads in his life, a crossroads that gave him a choice

5    between going forward in the path of life that was essentially

6    chosen and ready for him in a post-communism Russia, where the

7    opportunities to succeed were few and far between, and a path

8    that would allow him to harness his computer skills in what

9    now seems like the very early years of the internet.

10          You obviously know what path he chose.  There is no

11   denying that most of the conduct affected many people, not

12   only here in the United States, but in the world.  The

13   Government has made their point in that regard.  And there's

14   no denying that Mr. Levashov was, for a time, one of the more

15   well-known figures in the cyber world.

16          But what I think bears noting is the evolution of

17   those cyber laws and Mr. Levashov's actions, as in what he

18   actually did.  Mr. Levashov's involvement in cyberspace could

19   be traced back to the late 1990s when the internet was rather

20   young.  Not everyone had a computer or access to the internet,

21   particularly not people in Russia.  And the laws that govern

22   cyber crimes have evolved exponentially from the few that

23   there were 20 years ago to the hundreds, if not thousands,

24   that we have here today.

25          But what Mr. Levashov did can be boiled down to

1    spamming.  He began with the collecting of people's emails to

2    over the years collecting so many that people would use his

3    services to send out links and emails to a number of people

4    who would otherwise be unreachable.

5         And that's what Mr. Levashov was paid to do:  Send out

6    emails.  He did not develop any of the malware that was used

7    to infect people's computers; he did not personally obtain any

8    information from people's computers; he did not profit from

9    the ransomware that infected people's computers, or any other

10   aspects the Government highlighted in their submission.

11        And it is not to say he's not responsible or

12   accountable for all of that.  He surely is, and he's accepted

13   his responsibility for that.  And as with many cases of

14   accountability, there are always varying degrees of

15   culpability of the people involved.  And none of this is being

16   said to excuse his actions or what he did for a living, but

17   rather just put in a context -- an attempt to put in context

18   his involvement.

19        Because Mr. Levashov understands what he did was

20   wrong, but there was a time in his life where he thought his

21   participation and this sort of conduct was the only realistic

22   choice to get him and his future family out of the financial

23   circumstances that he had found himself in throughout his

24   entire life.

25        Mr. Levashov grew up in low-income housing, where his

1   entire family lived in a studio-sized apartment and had a

2   bathroom that was shared by the entire floor of the building.

3   Food was difficult to come by.  You had to get vouchers to

4   even get the most basic food, like loaves of bread; and stand

5   in line, hoping they would not run out before it was your

6   turn.

7          And, as Russia broke out of the communist regime --

8   Mr. Levashov was getting older and working odd jobs -- the

9   circumstances did not seem to change.  And as he went to

10  college and got his first job, he knew one thing:  That he did

11  not want his future family or his children to grow up with the

12  same types of hardships that he grew up with.  He believed

13  that the circumstances of the time when he got involved made

14  it impossible for him to become the husband or the father that

15  he ever strived to be.

16         His first job out of college was working as a systems

17  administrator for a transportation company where he earned

18  only $300 per month.  That's it.  And it was during this time

19  that Mr. Levashov started collecting people's email addresses,

20  legally.  And from there, as the saying goes, the rest is

21  history.

22         Ever since then, it was like Mr. Levashov had been

23  running in place, falling deeper into the work that he was

24  doing, unable to leave it, believing that without this, the

25  life that he wanted for his family was simply not available.

1          And it was this perceived difference between

2     Mr. Levashov and the people who he was hired by that makes it

3     a little bit easier to reconcile what he was doing between the

4     person that his friends and his family know him to be.

5          And you don't have to take my word for it, Your Honor.

6     Just look at the letters.  Whenever a friend or a family

7     member was in need, Mr. Levashov was the first one there to

8     help.  I don't want to belabor all the sentiments that were

9     echoed in the letters or in my memo -- I'm sure Your Honor has

10    read all of them -- but it's not a coincidence those who write

11    in support of Mr. Levashov see such virtues in him that we

12    only wish more people in this world would have.

13         And all the while, Mr. Levashov had been carrying his

14    own burdens around, burdens that made him feel as though he

15    was not good enough or not the person that he strove to be:

16    The burdens of a passed-away father whose guidance he could

17    not rely on; the burdens of a failed marriage, a marriage that

18    he had high hopes for, but was instead left for another man;

19    the burdens of a new family, but a complicated pregnancy that

20    led to the first thing that Mr. Levashov could truthfully and

21    nobly be proud of:  His son.

22         A son that he could teach, a son that he could be

23    there and provide for, and do the things that he and his own

24    father could not do.  But for the first three and a half

25    years, their life together was not what he imagined.  They

 1   were plagued with doctors' appointments, procedures, and

 2   experiments.

 3           And just as he was getting better, just as he was

 4   getting old enough for Mr. Levashov to communicate with him

 5   and teach him and be the father he wanted to be, Spanish

 6   police officers rushed into his hotel with machine guns and

 7   detained him away from his family in two separate rooms for

 8   hours; and then in two separate countries, as his family was

 9   sent back to Russia and he was held in Spain for a year in

10   jail, and then the remainder of the last four and a half years

11   where he was in custody in the United States, even further

12   away from his family.  In a country where he had no one.  And

13   no one to talk to, no one to rely on.

14           And since that day in Spain, he has missed the

15   majority of his son's life, four and a half years out of the

16   eight he's been alive, and most, if not all, of the life his

17   son remembers.  When he speaks to his father now, the

18   relationship that Mr. Levashov imagined is simply not there;

19   certainly not the kind a child has with his father when they

20   see each other daily and live together during these most

21   formative years of his life.

22           So if I may suggest, Your Honor, there has been a

23   significant burden in Mr. Levashov's pretrial detention that

24   is not generally associated by not only incarceration after

25   one's sentence has been fully adjudicated, but typical

1   pretrial detention that individuals experience in this

2   country.

3          In addition to the loss of liberty, it was a total

4   loss of support during the most uncertain times, the constant

5   malaise of not knowing, not only what your future holds, but

6   when you would learn of it, having to suffer through it

7   without the company or support of your family or friends, not

8   even with a brief jail visit, as they were literally on the

9   other side of the world.

10          Initially, at least, not knowing when he will be

11   sentenced or whether any of the days you've already spent in

12   jail will count or whether when you get out anything will

13   remotely resemble what it was when you left, if anyone will

14   still care.

15          There is a unique level of alienation, of fear, here

16   that ought not be deeply discounted for it is very clear,

17   debilitating, and does much to enhance the punishment that

18   Mr. Levashov has already suffered.

19          Now, I have tried to imagine how all of this must have

20   translated into the reality for Mr. Levashov, thankfully not

21   having experienced it myself.  Bernard Malamud's *The Fixer*, a

22   book in part about political oppression and preventative

23   detention, Malumud's central character describes the

24   experiences this way:  You wait.  You wait in minutes of hope

25   and days of hopelessness.  Sometimes you just wait.  There is

1  no greater insult.  You sink into your thoughts and try to

2  blot out the prison cell.  If you are lucky, it dissolves and

3  you spend half an hour out in the open, beyond the doors and

4  the walls and the hatred of yourself.  If you are not lucky,

5  your thoughts could poison you.

6        Mr. Kolpakov [sic] has spent four and a half years

7  away from his family, waiting without knowing the future.

8  First, the year in Spain where he did not know anyone, did not

9  know the language, and was being used as a political pawn in a

10  power struggle between the United States and Russia.  Having

11  never been incarcerated before, let alone arrested, he did not

12  know what to expect, what to do, whose advice to listen to, or

13  who to trust.  And then being shuffled on a plane, taken to

14  the United States, even further away from his family where he

15  has spent the last three and a half years, the majority of

16  which he was spent locked up in isolation, being exposed to

17  the strictest conditions of detention for the majority of that

18  time.  Even in the last year or so with no one around to lean

19  on in this time of need, when so many of us leaned on family

20  in an unprecedented pandemic.  But he had no one.

21        And all this time, he had to become bitter, cynical,

22  and indignant.  So for Mr. Levashov, like Malumad's *Fixer*, all

23  this while, "A day was a bad enough burden of time, but within

24  the day, even minutes could do damage if they piled up.  When

25  one" --

1          THE COURT:  Attorney Glozman?

2          MR. GLOZMAN:  Yes?

3          THE COURT:  I lost you.

4          MR. GLOZMAN:  Can you hear me?

5          THE COURT:  I can hear you now.  I lost you just a

6    moment ago when you were referring to isolation during the

7    pandemic.

8          MR. GLOZMAN:  And all that time during this isolation,

9    he had time to become bitter, cynical, and indignant.

10         So for Mr. Levashov, like Malumad's *Fixer*, all this

11   while, "A day was a bad enough burden of time, but within the

12   day, even minutes could do damage if it piled up.  When one

13   had nothing to do, when the first thing to have was an endless

14   supply of minutes.  It was like pouring nothing into a million

15   little bottles."

16         We know that the Government's position is that

17   Mr. Levashov brought much of this upon himself.  Yet it

18   remains that it fairly describes the last four and a half

19   years of his life.  And so, today, we will find out whether he

20   has completed his time of incarceration or if he is still at

21   the beginning stages of what lies ahead.

22         Your Honor, I can't even begin to presume the

23   difficulty of what you have to do here today.  But I do

24   respectfully ask you to take all these mitigating

25   circumstances into consideration, as well as the others that

have been previously brought to your attention.  We ask not only that you look at the face of the allegations of the Government, but to take into consideration the true character of Mr. Levashov.  What he did was wrong and he'll be the first person to admit it.  But he has done what he could and more to repent, and that is clear.

We need to look at the type of person he was during these transgressions and the circumstances that led to his involvement and decisions that landed him before this Court. And we have to look at what he has done and the type of person that he is now as opposed to four and a half years ago.  The change is undeniable.

Much of the further incarceration of Mr. Levashov would be a sentence that would have to do with deterring him from future crimes and protecting the public from future crimes that Mr. Levashov may commit.  And while me and the Government disagree on many things on this case, these two aspects -- is one that we may agree on.

To quote the Government on page 12 of their sentencing submission, "The Government does not believe that the need for specific deterrence or to protect the public from future crimes of Mr. Levashov are significant factors that must be considered in determining an appropriate sentence."

And that's the truth.  If this Court is going to worry about anyone reoffending, it should not be Mr. Levashov;

certainly not based off of everything that this Court now
knows about him, and not about who he was before, but even
more importantly, who he is now and will continue to be.

As I said before I started this all-too-long
presentation, I do not know Mr. Levashov as well as the people
who wrote the letters on his behalf, but I wholeheartedly
defer to their sentiment.  But I did get to know Mr. Levashov
fairly well over the last three and a half years, from the
first time I talked to him in lockup until today.

And from what I know about him, Your Honor, is that if
anyone deserves another chance, it's him.  What he did was
wrong, and he is the first person to admit it.  But he is a
good person and, like the people that wrote the character
letters for him, I see that in him unequivocally.  And for the
things that he's done over the course of his life, prior to
him needing to prove to this Court that his character is not
what is reflected in the indictment, as someone once said,
"What value is a good man's life if not given full measure at
his time of need?"  Well, Your Honor, this is his time of
need.

I know I've never argued before Your Honor before, and
being from Chicago, this may be my one and only time.  But it
is not usually my practice to tell a judge what the sentence
should be.  But what the Government's arguments and
submissions have failed to consider, however, is Mr. Levashov

1   as a person, the difficulties that he had to endure during his
2   life that led him to this behavior, the stresses of
3   confinement in the country where you have no one, do not know
4   the language very well, do not know the laws, and are battling
5   an unprecedented pandemic.

6          And I do not want to belabor all those other aspects
7   of mitigation that Your Honor has heard and read from.  Aside
8   from the offense of conviction, every aspect of Mr. Levashov's
9   life seems to me to weigh heavily in favor of leniency and
10  compassion, whatever that may be that Your Honor decides.

11         But, as Mr. Levashov would tell you, whatever sentence
12  Your Honor imposes, he will deal with and use it to become not
13  only the person that the closest people to him know him to be,
14  but to better himself, as he already has.

15         And so, we hope, Your Honor, that you take all of this
16  into consideration, and through the law of lenity sentence him
17  as leniently as you see fit under the law.  Thank you.

18         THE COURT:  Thank you.

19         Mr. Levashov, do you want to say anything on your own
20  behalf at this time?

21         THE CLERK:  Mr. Levashov, I believe you're muted.
22  There you go.

23         THE DEFENDANT:  Now it's good?

24         THE CLERK:  Yeah.

25         THE DEFENDANT:  Your Honor, it's really hard to say

```
 1    something to this beautiful speech of Mr. Glozman.  So I will
 2    be short in just using this occasion.
 3              I want to say a big thank you to my wife for support
 4    during this time.  And to my lawyer, Vadim Glozman, really big
 5    thank you for his support and for his job.  And I think I will
 6    stop on that.  Thank you.
 7              THE COURT:  Mr. Levashov, can you hear me?
 8              THE DEFENDANT:  Yes.
 9              THE COURT:  There was a technical difficulty that
10    prevented me from hearing what you said.
11              THE DEFENDANT:  Okay.
12              THE COURT:  I heard you thank your wife and your
13    lawyer?
14              THE DEFENDANT:  Yes.
15              THE COURT:  And then I lost the audio, and -- so I
16    couldn't hear what you were saying.
17              THE DEFENDANT:  Yes, Your Honor.
18              I fully agree with the speech of my attorney.  I do
19    apologize if my activities hurt someone, and that's it.
20              THE COURT:  All right.
21              THE DEFENDANT:  I think Mr. Glozman said everything I
22    want to say -- I apologize.  I fully agree with him.  It was
23    like a story of my life.  I almost started crying.
24              So I agree with him, and that's it.
25              THE COURT:  Thank you.
```

1          Mr. Chang?

2          MR. CHANG:  Yes, Your Honor.  I think it's a

3     significant challenge to try to go back in time and see who

4     was the person in the late 1990s and early 2000s who started

5     committing this crime.

6          I understand, obviously, the degree of financial

7     deprivation and difficulty, obviously, that Mr. Levashov and

8     his family were facing back 20 years ago.  But at the same

9     time, I think it's important for the Court to remember that

10    Mr. Levashov graduated with an advanced degree in computer

11    science.  I believe it's stated in the PSR that he graduated

12    at the top of his class.

13         And while that may not have given him the type of

14    opportunities that were available in the United States,

15    certainly with his education and his obvious intelligence and

16    capabilities, he could have taken care of his family

17    without -- without turning to crime.

18         Now, to be fair, I think that what actually happened

19    with Mr. Levashov is that he started out by engaging in what

20    seemed to him at the time to be a relatively harmless crime,

21    sending out spam.  And then, as that became more and more

22    lucrative, he probably -- and I -- like I say, this is

23    certainly some speculation on my part.  I can't say that I was

24    there with him, obviously, at the time, I don't know.

25         But, you know, as he's engaging in this profitable

1    spam enterprise activity, you know, he engages -- he starts to

2    realize he's up in a fight with Microsoft and antivirus

3    vendors and anti-spam vendors.  And certainly at some point

4    along the way he should have realized that what he is doing is

5    really wrongful, and that he should have reflected back then

6    that, Listen, all these companies are trying to stop me.  Why

7    am I engaging all of my education and all of my abilities to

8    defeat these legitimate companies that are trying to protect

9    people?

10          So there are two narratives there.  I understand the

11   personal narrative, the difficulties of where he was coming

12   from, but at the same time, he wasn't somebody without

13   opportunity.  I'd like to say a little bit, Your Honor, in

14   terms of understanding where Mr. Levashov's criminal conduct

15   fits in the kind of spectrum of cyber crime culpability.

16          And the way I think of that, typically, is along two

17   axes, if you will.  I mean, the first axis is the type of

18   crime that is being conducted, because, you know, cyber crime

19   obviously covers a lot of ground.  And Mr. Levashov is

20   primarily charged with spamming and operating botnets, you

21   know, stealing other people's computer resources to conduct

22   spamming activity.  And that spamming was done at some point

23   with his knowledge in support of other criminal activity,

24   whether it's ransomware or pump-and-dump schemes and that kind

25   of thing.  But primarily what he thought he was doing was

1    spamming.

2          Now, on the more culpable side of things, I would say

3    that running a botnet -- running three very large botnets is a

4    very, very significant crime, from the Government's

5    perspective and from society's perspective because botnets are

6    basically tools that are used by cyber criminals for all sorts

7    of purposes, and I think we alluded to those in our memo.

8          They can be used for distributing malware, for denial

9    of service tax, that kind of thing.  But to be fair,

10   Mr. Levashov was not primarily using the botnets for those

11   purposes; he was using them to send spam.  He wasn't

12   personally sending out ransomware attacks for the most part of

13   the sort that we see hitting the headlines today.

14         And so, in the spectrum of how wrongful his criminal

15   conduct was, operating a botnet is really a crime of the

16   greatest importance to the government and society.  In his

17   particular case, it was really the pre-ransomware days before

18   the heyday that really took place in the last three or four

19   years, and he wasn't engaged in that most culpable type of

20   activity for the most part.

21         The other act that I would like to bring to the

22   Court's attention in evaluating a defendant such as

23   Mr. Levashov is:  What is his role in conducting the crime?

24         And in this case, you know, there are different people

25   who have different roles in any given cyber crime.  These

days, very few cyber crimes are conducted by a sole hacker
sitting in the dark in the basement.  It just doesn't work
that way anymore.

Mr. Levashov's role, I think, actually was a very
highly culpable role.  He was, as I said, very well-educated,
and he was running these botnets, and he was -- at least with
the latitude botnets, Waledoc and Kelihos, he was the one
primarily responsible for those two botnets.  There are much
less culpable people out there.

For example, you know, if there's a money mule who's
transferring funds, the Court sees money mule cases all the
time.  Those people are probably less culpable than somebody
like Mr. Levashov.  But, again, to be fair, I think there are
people more culpable than Mr. Levashov.  And I put in that
category people who are actually compromising victims'
computers and actually, you know, deploying -- attacking the
vulnerability.

So in Mr. Levashov's case, he wasn't actually breaking
into a computer; he was buying access to computers that were
already compromised.  So he was part of a criminal ecosystem
where he was paying people for access to compromised
computers, and he was loading his malware into it.

So those are the kind of two spectrums that I would
give to you.  He is not quite at the top of both -- he is not
quite at the top of both axes of criminal conduct, but I do

1  think he is high up on both axes.  And the Government would

2  ask that in light of those factors, that the Court give close

3  consideration to the sentence that is imposed in this case.

4  Thank you.

5          Your Honor, you're on mute.

6          THE COURT:  Thank you.  At this time, we're going to

7  take a recess.  We'll be in recess for 20 minutes, and then we

8  will resume.

9                    (A recess was taken.)

10         THE COURT:  There are two things I need to raise with

11 you briefly.  The first is the absence of a financial

12 statement.  I don't know whether efforts were made to prepare

13 a financial statement for the probation office, but we don't

14 have one as yet.  And as a result, I don't know what

15 Mr. Levashov's financial circumstances might be.  This is

16 pertinent to restitution as well as his ability to pay a fine.

17         Subsequently, let me ask counsel to comment.  And I'll

18 start with Attorney Glozman, please.

19         MR. GLOZMAN:  Your Honor, there were considerations in

20 effect when we made the -- when we made the decision not to

21 put together a financial statement, and I made the Government

22 aware of that and they were aware of that.

23         At this point, that's all I'd like to say on the

24 record.

25         THE COURT:  All right.  Any comments by the

```
1   Government?

2         MR. CHANG:  No, Your Honor.

3         THE COURT:  Let me ask counsel to suggest what you

4   think I should do in the absence of a financial statement.

5         MR. GLOZMAN:  Your Honor, given the enormity of the

6   restitution in this matter, I think regardless of

7   Mr. Levashov's financial situation, I don't think there would

8   be an ability to pay any fine.  And the restitution was

9   already agreed upon in the plea agreement.

10        On top of that, I believe under the law you have to

11   enter the special assessment as to each account.  So there's

12   no objection to the special assessment.

13        THE COURT:  With regard to restitution, what do you

14   want me to do?

15        MR. GLOZMAN:  Just go along with the restitution as

16   it -- in the forfeiture as it is outlined in the plea

17   agreement.

18        THE COURT:  All right.  Please bear with me.

19        MR. GLOZMAN:  I think, your Honor, in this case, as

20   you found, there was no loss; it was more of a gain.  There

21   would be no restitution; it would just be a forfeiture of the

22   gain and the other items enumerated in the plea agreement.

23        THE COURT:  Attorney Chang, what suggestion would you

24   have for me with regard to restitution?

25        MR. CHANG:  Your Honor, the only restitution claim I'm
```

1  aware of is the claim that was filed just today pertaining to

2  a restitution claim that goes back to something like 2005 to

3  2007.  In -- and in the motion papers, it appears that this

4  claim was submitted -- was addressed by the Assistant U.S.

5  Attorney who was handling the case before me who determined

6  that the restitution claim was not appropriate because it

7  predated the crimes for which Mr. Levashov has pled guilty.

8         I haven't had a chance to look at the law on that

9  subject, but I -- I think that's probably correct.  But I --

10  the individual filing the restitution claim did ask that the

11  Court hold any determination of restitution for 90 days, which

12  I think is permitted by statute; and I think that unless there

13  is clearcut law that the Court is aware of as to whether that

14  2005 restitution claim might be applicable for crimes

15  committed, at least pled guilty to, relating to the 2015/2017

16  time frame, I think it would make sense to hold the

17  restitution portion of his sentencing open.

18         As far as the fine, Your Honor, I think that the Court

19  should not assume that the Defendant is not capable of paying

20  a fine, as Mr. Glozman suggested.  I think the burden on that

21  ought to be with the Defendant, who ought to file the

22  financial statement.

23         And so, the Court should, I think, impose a fine that

24  would be appropriate in this case under the guidelines.

25         THE COURT:  Anything further on that, Attorney

1    Glozman?

2            MR. GLOZMAN:  No, Your Honor.  My only issue with the

3    fine is there is a substantial forfeiture here that the

4    Government is seeking, and regardless of what they think he

5    may have or not have is just unrealistic that he would be able

6    to pay $3 and a half million forfeiture and a fine on top of

7    that in his lifetime.

8            MR. CHANG:  The forfeiture motion does not -- I'm

9    sorry, Your Honor.  Were you going to --

10           THE COURT:  No, please go ahead.

11           MR. CHANG:  I was just going to point out that the

12   forfeiture does not seek a $3.5 million money budget.  It does

13   seek forfeiture of specific assets that have been identified

14   by the Government, including a web money account used by the

15   defendant.  But it doesn't do anything that would impact

16   potentially his future income or anything of that sort.

17           THE COURT:  Well, I agree that in the circumstances, I

18   should refrain from trying to do anything today with regard to

19   a final restitution order.  I do not mean to suggest that I

20   think restitution is appropriate; it's just a matter of

21   figuring out the amount.  No.  Instead, I think it's prudent

22   to simply defer entry of a final order, as I believe the

23   statute permits me to do, for a period of 90 days.

24           On the subject of the fine, the law says that the

25   burden is on the Defendant to demonstrate that he's unable to

1  pay a fine within the guideline range.  And in the absence of

2  financial statements, Attorney Glozman, that burden has not

3  been met.

4         Now, if what you are suggesting is that the forfeiture

5  that has been agreed upon renders Mr. Levashov indigent and in

6  capable of paying a fine, then so be it.

7         In that event, I would need to have a financial

8  statement that substantiates your representation.  Not because

9  I question your veracity or reliability as counsel, not at

10  all; but just because that's what the law would require of us

11  in this circumstance.

12        If that is not the case, in other words, if the

13  forfeiture that has been agreed upon does not render

14  Mr. Levashov indigent, then I would impose a fine, unless you

15  ask for an opportunity to submit a financial statement that

16  would demonstrate indigency.

17        Do you follow me?

18        MR. GLOZMAN:  I do follow, Your Honor.  These are

19  things that I would have to talk with the Government about off

20  the record, and I thought it was understood between the

21  parties.  This is the first time that this issue is coming to

22  light.  The Government has been well-aware of this since we

23  entered the plea agreement, and the reasons for not having a

24  financial statement.  So it's coming as a bit of surprise,

25  their position, right now.

1          MR. CHANG:  And, Your Honor, the fault may be on the

2     part of the Government.  As I've said on a couple of

3     occasions, I wasn't there when a plea agreement was

4     negotiated.  So this issue is coming to light for me for the

5     first time as well.

6          THE COURT:  All right.  I am not aware at the moment

7     of whether I can defer a final order with regard to the

8     subject of the fine pending your submission of additional

9     information on that subject.  But I'm going to assume that I

10    have that authority, similar to the authority that applies to

11    restitution, and rather than reschedule the hearing until

12    after you have a chance to provide me with additional

13    information, I'm going to proceed with the other aspects of

14    sentencing and hold open both the restitution and the

15    possibility of a fine.

16         Accordingly, I'll turn to the question of what

17    sentence is sufficient without being harsher than necessary to

18    serve the purposes of the criminal sentence in this case.

19         MR. CHANG:  Your Honor?

20         THE COURT:  Yes.

21         MR. CHANG:  I'm very sorry for interrupting.  I'm

22    wondering if the Court would just for the record inquire

23    whether Mr. Levashov would consent to that procedure?

24         THE COURT:  All right.  That's a good suggestion.

25         Any objection to my deferring on the fine and

1   restitution, Mr. Levashov?

2          MR. GLOZMAN:  No, Your Honor.

3          THE COURT:  All right, thank you.

4          MR. CHANG:  Thank you.

5          THE COURT:  Mr. Levashov, as we discussed at the time

6   of the change of plea, the law that applies to sentencing in

7   Federal Court in the United States provides that the sentence

8   of the Court must be sufficient, but not harsher than

9   necessary, to serve certain stated purposes, specifically to

10  impose just punishment for the criminal conduct, to provide

11  adequate deterrence to future criminal conduct on the part of

12  the individual, as well as others who might be tempted to

13  engage in similar conduct, and to provide the individual with

14  needed care and treatment in the most effective manner.

15          In determining what sentence is sufficient to serve

16  these purposes, in any given case, the Court is required to

17  consider the applicable guideline range as well as the

18  individual's history and characteristics as shown by the

19  presentence report and the submissions of the parties.

20          And the Court needs to take into account the

21  importance of being evenhanded in sentencing so that any

22  person who committed the offense conduct before the Court

23  would expect to receive the same or a substantially similar

24  sentence, unless there was something significant that

25  justified a different sentence.

1          In this case, we have a guideline range that is very

2   high.  And as I indicated earlier today, I think that the

3   guideline range substantially overstates the seriousness of

4   your misconduct.  No doubt your misconduct was serious, but I

5   think that a sentence in the range suggested by the guideline

6   would be plainly excessive for you, considering your role in

7   the offense conduct and your individual culpability.

8          I think that Attorney Glozman and Attorney Chang have

9   done an admirable job of assessing your individual

10  culpability.  I agree that your misconduct merits a

11  significant punishment; but at the same time, I recognize that

12  you were essentially spamming at the start, and you found

13  yourself in a situation where people were seeking your

14  services and were willing to pay you for your services, which

15  from your point of view continued to be in the nature of

16  spamming.

17         It must be recognized that there came a time when, as

18  Attorney Chang explained, you must have realized that what you

19  were doing was serious and wrongful, and it goes without

20  saying that somebody who builds and operates botnets as you

21  did and profits from making them available for use by cyber

22  criminals should expect to be prosecuted and punished because,

23  indeed, this is significant criminal conduct that is harmful

24  to the public.

25         I don't undertake to suggest what I think the

guideline range should be as a policy matter in general or what it should be in this particular case.  I'm not obliged to do that.  Instead, I will focus on your history and characteristics.  And I find myself in agreement with counsel that as a result of your experience in this case, you are unlikely to offed again.  And accordingly, in deciding what the sentence should be for you, I am not concerned that you are likely to offend again.

You are a true first offender, meaning that, as far as we know, you had had no prior experience in the criminal justice system in any country.  You'd never been arrested before.  And therefore, your likelihood of recidivism is statistically very low, and I think that from what all we have learned about you, you are, in fact, unlikely to offend again.

For me, then, the question becomes:  What sentence is minimally necessary to provide adequate deterrence to others and to avoid unwarranted disparity in sentencing?  Because facilitating cyber crime is so significant, I am concerned that unless I sentence you to additional incarceration, the sentence could be viewed as depreciating the seriousness of what you did and failing to provide adequate deterrence to others.

I have considered that in coming to my decision today.  But for reasons that I'm going to explain momentarily, I have decided that a sentence of time served is sufficient.  I've

1  reached that conclusion based on a variety of factors,

2  including especially the following.

3         One:  You have already been in custody for

4  approximately 33 months, that being the amount of time you

5  spent after you were arrested in Spain, in jail there, and the

6  amount of time you spent in custody here before you were

7  released to home confinement with electronic monitoring in

8  2020.

9         Thirty-three months is a long time, and I'm sure it

10 was especially difficult for you, considering that you were

11 away from your wife and child, away from home.  And so, that

12 33 months is significant.  Also, the time that you have spent

13 on home confinement with electronic monitoring needs to be

14 weighed in the balance, as was pointed out.

15        You have been confined essentially in isolation during

16 the pandemic, unable to be with your wife and child for a long

17 period of time.  And I think that's entitled to -- and

18 properly receives significant weight because it appears,

19 Mr. Levashov, that you are, in fact, a very dedicated husband

20 and father.  And I say that, understanding that you have

21 spoken with your wife virtually on a daily basis all this

22 time.  And so, that's a significant factor.

23         Second:  You accepted responsibility early on in this

24 case.  You made no bones about it when I met with you at the

25 time of the change of plea.  I was impressed with your

1    acceptance of responsibility.  You have been fully compliant

2    with the conditions of your pretrial release, and those

3    conditions have not been easy for you, as I have explained.

4    You have lived in isolation far from home and far from your

5    wife and child, with whom you are very close.

6         Your wife and son both have medical conditions which

7    are described in the record available to me, which I'm sure

8    has made your separation from them particularly difficult for

9    you.  And I note that you, yourself, appear to have developed

10   a medical condition during these past few years.  I hope that

11   turns out not to be significant, but I am aware of it as well.

12        I think that your prompt and complete acceptance of

13   responsibility reflects a determination on your part to do

14   what you can to make up for your wrongdoing and to do the

15   right thing going forward.

16        This is significant to me because it tells me that the

17   punishment you have received could be considered sufficient,

18   and this is another factor in my decision that a sentence of

19   time served is sufficient for you.

20        Finally, the further reason to impose a sentence of

21   time served:  It is my expectation based on what I've learned

22   that you will be available for a term of supervised release

23   and, as part of that, you will be subject to certain special

24   conditions which are a form of -- not punishment, per se, but

25   still restrictions on your liberty that can be taken into

1  account in concluding that the sentence of time served is

2  sufficiently necessary.

3        So that is the sentence, a sentence of time served.

4  And I do impose a sentence of supervised release for a period

5  of three years.  While on supervised release, you will have to

6  comply with the mandatory and standard conditions of

7  supervised release, which will be given to you in writing.

8        And if you have any questions about those conditions

9  or any other aspect of your supervised release, you will want

10  to speak with your probation officer, who will be available to

11  assist you as needed.  In addition to those mandatory and

12  standard conditions, I am imposing special conditions.

13        One:  In the event restitution is ordered, you will

14  pay restitution while on supervised release in accordance with

15  a schedule that will be established.  And because I have

16  deferred on restitution for a period of 90 days, we don't know

17  what the restitution will be, but in the event restitution is

18  imposed, then you will have to pay it in accordance with the

19  schedule that I will adopt in light of your financial

20  circumstances.

21        As a further special condition, you will consent to

22  computer monitoring by the Government to ensure that you are

23  not using your extraordinary skills in a way that is illegal.

24  I will invite counsel to provide me with suggestive language

25  for this computer restriction.  The presentence report

```
 1   included a special condition along this line.  I believe it's

 2   in paragraph 102 of the report, subsection 5.

 3          As you see in that subsection, the special condition

 4   would state as follows:  You must permit the probation office

 5   to install monitoring software on any and all electronic

 6   devices owned, controlled, or used by you for the purpose of

 7   determining whether you are producing or distributing botnets,

 8   spam, or malware, and you will pay for those based on your

 9   ability to pay.

10          Also, you would not be permitted to download or use

11   any application that would prevent the probation office from

12   monitoring your electronic devices.

13          Any objection to that, Attorney Glozman?

14          MR. GLOZMAN:  Just if we could work on the languages,

15   Your Honor.  I'm not aware of any specific software

16   capabilities to monitor those things without infringing upon

17   his other privacy rights.

18          THE COURT:  Then I would ask you to follow up with

19   suggested language in the next couple of days.

20          MR. GLOZMAN:  Understood.

21          THE COURT:  And as a final special condition,

22   Mr. Levashov, if you are removed from the United States, you

23   will remain outside the United States unless you are legally

24   authorized to re-enter.  If you do re-enter the United States

25   during the three-year period, then you will be required to
```

```
 1   report to the nearest probation office within 72 hours after
 2   you return to the United States.
 3         I'm deferring on the imposition of a fine as well as
 4   restitution, but the law requires a payment of $100 for each
 5   of the four counts of conviction, for a total of $400.
 6         In your plea agreement, you waived your right to
 7   appeal so long as your sentence did not exceed a sentence in
 8   excess of what I have imposed today.  But even so, you may
 9   still have a right to appeal.  You would be able to appeal if
10   you believe that your Constitutional Rights have been
11   violated.
12         And in that event, you would need to file a notice of
13   appeal within ten days -- I'm sorry, within two weeks of the
14   entry of the written judgment.  The written judgment is likely
15   to be entered in a week or so.  And so, you would have two
16   weeks from then in which to file the notice of appeal, again,
17   if you believe that your Constitutional Rights have been
18   violated.
19         If you have any questions about that, you should speak
20   with your counsel.  Let me ask if there is anything that I
21   have overlooked.
22         Attorney Chang?
23         MR. CHANG:  No, for the Government.
24         THE COURT:  Attorney Glozman?
25         MR. GLOZMAN:  No, Your Honor.  I want to circle back
```

```
 1   about the issues that are left open.

 2          THE COURT:  All right.  Then I think we have completed

 3   all that we need to do for the moment.

 4          Mr. Levashov, is there anything you would like to say

 5   at this time?

 6          THE DEFENDANT:  No, Your Honor.  Thank you.

 7          THE COURT:  All right, then.  I believe we can

 8   adjourn.

 9          MR. CHANG:  Your Honor, would the Court entertain the

10   Government's motion to dismiss the remaining counts of the

11   indictment at this point?

12          THE COURT:  Yes, and that motion is granted.

13          MR. CHANG:  Thank you, Your Honor.

14          THE COURT:  Mr. Levashov, I will tell you that while

15   on supervised release, you will want to have a good

16   relationship with your probation officer.  The role of the

17   probation office is to help people succeed on supervised

18   release, and I hope you will bear that in mind.

19          I believe that you have a lot to offer and hope that

20   you will do your best to be a positive and contributing member

21   of society.  And I hope that when you look back on this

22   experience, you will see that you managed to go on to have a

23   full and good life for yourself and your wife and your child.

24          And once you complete your term of supervised release,

25   you will have the standing in the community of any other
```

1    member of the community, and fully able to go on and have the

2    good life that we all wish for you.

3             And at this point, Mr. Clerk, we can adjourn.

4                  (Proceedings concluded, 4:08 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          CERTIFICATE

2                     RE: U.S. v. LEVASHOV

3                      3:17-cr-00083-RNC

4

5        I, Cassie Zayas, Court Reporter, do hereby certify

6    that the foregoing 52 pages, 1 through 52, are a true and

7    accurate transcription of my shorthand notes taken in the

8    aforementioned matter to the best of my skill and ability.

9

10

11

12        _____

13             Cassie Zayas, Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```